EXHIBIT NO. 7

```
 1        IN THE EIGHTEENTH JUDICIAL DISTRICT COURT
                 BUTLER COUNTY, KANSAS
 2                  CIVIL DEPARTMENT

 3   JULIE A. BURKHART,            )
                                   )
 4                                 )
              Plaintiff,           )
 5                                 )
         vs.                       ) Case No. 2013 DM 1453
 6                                 )
     MARK HOLICK,                  )
 7                                 )
              Defendant.           )
 8   _____)

 9

10

11   

12

13

14

15              VIDEOTAPED DEPOSITION OF

16                 JULIE A. BURKHART

17

18   taken on behalf of the Defendant, pursuant to Notice to

19   Take Deposition, beginning at 10:50 a.m. on the 11th day

20   of April, 2014, at the Thompson Law Firm, 106 East 2nd

21   Street, in the City of Wichita, County of Sedgwick, and

22   State of Kansas, before Lee Ann Bates, CSR, RPR, CRR.

23

24

25
```

FILED UNDER SEAL              EXHIBIT 7
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PLAINTIFF'S
EXHIBIT
7

```
 1              A P P E A R A N C E S :

 2

 3

 4   ON BEHALF OF THE PLAINTIFF:

 5        Mr. Robert Eye
          Robert Eye Law Office, LLC
 6        123 SE 6th Avenue
          Suite 200
 7        Topeka, Kansas  66603
          (785) 234-4040
 8        bob@kauffmaneye.com

 9        and

10        Ms. Erin C. Thompson
          Thompson Law Firm, LLC
11        106 East 2nd Street
          Wichita, Kansas  67202
12        (316) 267-3933
          ethompson@tslawfirm.com
13

14

15   ON BEHALF OF THE DEFENDANT:

16        Mr. Donald A. McKinney
          McKinney Law Firm, Inc.
17        5 Douglas Avenue
          Wichita, Kansas  67207
18        (316) 686-1477
          damlaw1@cox.net
19

20

     ALSO PRESENT:
21
          Tiffany Stephenson, Videographer
22

23

24

25
```

**Page 33**

```
 1   Q   And there was media coverage related to your seeking
 2       a protection from stalking order against Mr. Holick.
 3       True?
 4   A   Seemed to be some interest, yes.
 5   Q   And you knew before you filed this it's probably
 6       going to be -- well, even before you filed this,
 7       that this petition you filed would become a public
 8       record?
 9   A   Um, I guess.  You know, I really didn't think about
10       that.  Um, it was I wanted a protection from
11       stalking because he was out in front of my home
12       trying to harass me and intimidate me.
13               MR. McKINNEY:  Okay.  I object to the
14       volunteered nonresponsive portion and move to
15       strike.
16   Q   Here's my question:  When you put down Pastor
17       Holick's home address and home phone number and his
18       e-mail address in this form, you gave no thought for
19       Pastor Holick's privacy, did you?  You had other
20       motivations?
21   A   No, I did not have other motivations.
22   Q   I thought you just told me you had a motivation
23       about protecting your home or something.
24   A   Well, I wanted to not have him come to my home
25       anymore and threaten me.
```

**Page 34**

```
 1   Q   Right.  That was your motivation?
 2   A   And so I was filing this temporary protection from
 3       stalking and I knew that he needed to be served and
 4       I knew that I needed to provide information, um, and
 5       so I just simply filled out the form, Home, Work,
 6       Other.
 7   Q   And then you added his e-mail address at the bottom?
 8   A   That's correct.
 9   Q   Okay.  Now, here's my question:  When you filled out
10       this information with the personal information about
11       Mr. Holick and filed it with the court, you did not
12       have any concern about Mr. Holick's privacy, did
13       you?
14   A   I didn't have any reason to believe that his privacy
15       would be jeopardized.
16   Q   So that's a yes?
17   A   Yes.
18   Q   Okay.
19   A   Yeah.
20   Q   Now, let's go to the next page.  See that -- first
21       of all, have you ever met Pastor Holick?
22   A   I can't say I've ever met him.
23   Q   Okay.
24   A   I have seen him.
25   Q   Okay.  So you've never personally met Pastor Holick?
```

1
2      MR. EYE: Objection; asked and answered.
3
4      You may answer. Go ahead and answer.
5      THE WITNESS: No.
BY MR. McKINNEY:
6  Q   Okay. I think we got a double negative there. I
7      said, "You've never met Pastor Holick?" and you said
8      no.
9  A   I've seen him.
10 Q   Okay. You've never met Mr. Holick face-to-face,
11     have you?
12 A   I have seen him but I've never met him.
13 Q   Okay. Where did you see him?
14 A   He has been in front of my home protesting in my
15     neighborhood and he's been in front of my clinic
16     protesting, so I have seen him from afar on
17     surveillance cameras or out a window.
18 Q   Okay. So other than seeing Mark -- Pastor Holick
19     from afar or out of a window, you've never had any
20     personal contact with him, have you?
21         MR. EYE: Objection; asked and answered.
22         You may answer.
23 BY MR. McKINNEY:
24 Q   True?
25 A   No.
   Q   Is that true?

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

---

1  A   I've never -- I do. I do not know him. I guess I
2      don't know what you're trying to get at.
3  Q   Well, I'll repeat it. Other than seeing Pastor
4      Holick from afar or out of a window, you have never
5      had any contact with him?
6  A   I've also watched him on surveillance cameras.
7  Q   Okay. Other than those three -- let me start over.
8      Other than seeing Pastor Holick from afar or out a
9      window or on a surveillance video, you have had no
10     contact with Pastor Holick. True?
11 A   True. Maybe during, um, the Summer of Mercy Renewal
12     in 2001 when he was there protesting Dr. Tiller's
13     clinic with, uh, to finish the job, um, I might
14     have, um, been in closer proximity to him.
15 Q   But you're not sure about that; right?
16 A   Hmm. Not entirely sure, no.
17 Q   Okay. I just want to ask you about the things today
18     that are probable. Okay? Is it likely true that
19     other than seeing him from afar or out of a window
20     or on a surveillance video, you have had no contact
21     with Mark Holick?
22 A   Correct.
23 Q   Okay. He's never spoken directly to you, has he?
24 A   Um, he's yelled through a bullhorn at me, so I don't
25     know if that's considered speaking directly to me,

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

**Page 41**

```
 1   A   Excuse me?
 2   Q   You said he stated publicly that he was in front of
 3       your house that day.
 4   A   Mm-hmm.
 5   Q   Where did he say that?
 6   A   In the press.
 7   Q   Where at?
 8   A   Uh, the Wichita Eagle.
 9   Q   When would that have appeared in the Eagle?
10   A   Um, later -- later that month or maybe in March.
11       Um, it was in there, yeah, later in February or
12       March.
13   Q   So you formed the opinion that it was Mark Holick on
14       the bullhorn because first, he was known to you as
15       the leader of the protests?
16   A   Correct.  The protests, he was the leader of the
17       protests in front of my house on both of those
18       dates.
19   Q   Okay.
20   A   And he'd also coordinated with law enforcement and,
21       well, given them a heads-up regarding the first
22       protest.
23   Q   Okay.  I just want to get all the evidence here.
24       You formed the opinion that Mark Holick was on the
25       bullhorn -- well, let me back up.
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

41

**Page 42**

```
 1   Q   Um, this protest in front of your house, that
 2       was on the sidewalk, wasn't it?
 3   A   Uh, correct.
 4   Q   The police were there; right?
 5   A   On the first occasion.
 6   Q   Okay.
 7   A   I called 911 on the second occasion.
 8   Q   Okay.  On the second occasion, did you see the
 9       police cars a couple houses down from your house
10       that day?
11   A   Which occasion?
12   Q   February, 2013.
13   A   No.
14   Q   Okay.  When you called the police, they came to your
15       house; right?
16   A   Correct.  Two officers.
17   Q   On February 15, 2013?
18   A   Uh-huh, correct, uh-huh.
19   Q   Do you know where they came from?
20   A   No, I don't.  I called 911.
21   Q   So for all you know, those officers could have been
22       in your neighborhood watching the protest?
23              MR. EYE:  Object to the form.  You may
24       answer.
25              THE WITNESS:  Okay.  Uh, no, I don't
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

42

Case 6:16-cv-01188-JWB   Document 259-7   Filed 01/04/19   Page 6 of 51

1  Q   Okay.  And where were -- when you drove by and, and
2      stopped for a few minutes at Belmont and English,
3      where were these officers located?
4  A   At that corner.
5  Q   Of Belmont and English?
6  A   Yes.
7  Q   And which part of that corner?  Northeast,
8      southwest?  Where?
9  A   Uh, they were parked on the, um, southeast side, I
10     believe.  Maybe one was parked on the southwest side
11     but on Belmont going south.
12 Q   What other officers were there that day,
13     November 17th?
14 A   Um, I don't know.  I think there were maybe one or
15     two other officers, but I can't recall their names
16     or --
17 Q   Do you know Walker Andrews?
18 A   Yes.
19 Q   Was he there?
20 A   I don't recall him.
21 Q   How far is your house from the corner of Belmont and
22     English?
23 A   Um, three houses.
24 Q   How far is your house from the corner of Douglas and
25     Belmont?

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

49

1  A   Um, nine houses.
2  Q   Would it be true that that block there from Douglas
3      down Belmont Street to English is a rather long city
4      block?
5  A   Um, I don't know.  It seems like a regular block to
6      me.
7  Q   Okay.  Well --
8  A   I don't --
9  Q   Well, it has 11 or 12 houses on it.
10 A   Okay.
11 Q   Is that true?
12 A   Uh --
13 Q   On both sides?
14 A   Nine, 10.  There would be --
15 Q   Each side has 11 or 12 houses?
16 A   There would be 10 houses on the Belmont side because
17     the one that's on Belmont and English, she and her
18     husband have the English address, so there would be
19     10 on our side of the street, I think.
20 Q   Okay.  Well, let's not distinguish between which way
21     they face or what address they have.  Isn't it true
22     that if I started at Douglas and drove down Belmont
23     to English and counted the houses on the west side,
24     I would count 11 houses?
25 A   Um, I -- yeah, approximately, I guess.

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

50

1  Q   Okay.  Now, apart from College Hill, have you
2      noticed that most city blocks don't have 11 houses
3      on the block?
4  A   Honestly, no.  I've -- it's --
5  Q   In any event, if somebody is at any of these events
6      described in your petition and they are standing at
7      the corner of Douglas and Belmont, they're going to
8      be approximately nine houses from your house.  True?
9  A   Correct.  They --
10 Q   Okay.  Now, I need to go back to you were telling me
11     why you think it was Mark Holick on the bullhorn,
12     uh, in February of 2013.  First, you said because
13     he's the leader of the protesters; right?
14 A   Um, he's the leader of that group that was coming
15     into my neighborhood.
16 Q   Okay.
17 A   Mm-hmm.
18 Q   Second, they had the same signs.  You said signage
19     was the same?
20 A   Mm-hmm, yes.
21 Q   Correct?
22 A   It was the same group, mm-hmm.
23 Q   And then thirdly, you said that he stated in the
24     press that he was there?
25 A   That's correct.

51

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

---

1  Q   Okay.  Now, in this statement in the press, did he
2      say he was standing in front of your house?
3  A   Um, you -- I, I would have to look back at his
4      wordage, so --
5  Q   Do you have a copy of that --
6  A   -- so he would --
7  Q   -- article?
8  A   Um -- yeah.  Here it says, "He confirmed Saturday
9      that there was a group of us that went to Burkhart's
10     home.  We had several signs.  One of the signs that
11     did say that," which was Where's Your Church.  Yep,
12     it says right here.
13             MR. EYE:  The record should reflect the
14     witness is reading from the *Wichita Eagle* article
15     that --
16             THE WITNESS:  Can I get some more coffee?
17     Can I -- is that --
18             MS. THOMPSON:  Sure.
19             THE WITNESS:  I guess I can't leave the
20     room.
21             MR. McKINNEY:  If nobody has an
22     objection, I'm going to mark this.
23             MR. EYE:  I'm sorry?
24             MR. McKINNEY:  If nobody has an
25     objection, I'm going to mark this.

52

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

1    MR. EYE: That's fine.  It would be 3?

2    MR. McKINNEY: Yes.

3    (Burkhart Deposition Exhibit No. 3

4    marked for identification.)

5    MR. McKINNEY: Make that 4.

6    (Burkhart Deposition Exhibit No. 4

7    marked for identification.)

8    (Discussion held off the record.)

9    (Burkhart Deposition Exhibit Nos. 5

10   and 6 marked for identification.)

11   BY MR. McKINNEY:

12   Q. Okay. I'm going to go back to the incident of

13   November 17, 2012. You told us you were not present

14   for that event except for a few minutes when you

15   drove by and stopped at the corner of Belmont and

16   English to talk to some officers?

17   A. That's, that's correct.

18   Q. Okay. What, what was said in your conversation with

19   Officer Hinner?

20   A. I don't recall. I mean, I probably told him I was

21   just coming by to see how things were going at my

22   house and in my neighborhood, but I don't recall,

23   really, what we talked about.

24   Q. Okay. You don't recall anything he said?

25   A. No.

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

---

1    Q. Is that true?

2    A. Yes.

3    Q. Okay. The problem we get to is I ask you if you

4    don't recall something and you say no, we have a

5    double negative and we don't know what it means, so

6    I have to clarify that, so we know what's going on.

7    A. All right.

8    Q. I'm not trying to badger you. Okay. Okay. What

9    about your conversation with Agent Fitzgerald? What

10   was said in that one?

11   A. I don't recall.

12   Q. Okay. When you talked to David -- to David Hinner

13   of the Wichita Police on November 17, 2012, in your

14   neighborhood, did you make any complaint about Mark

15   Holick?

16   A. Well, they knew I wasn't happy about protesters

17   being in my neighborhood to harass me and disrupt my

18   life.

19   MR. McKINNEY: Okay. That's

20   nonresponsive and I'll object and move to strike.

21   Q. On November 17, 2012, when you talked to Officer

22   Hinner near the corner of Belmont and English, did

23   you complain about Mark Holick?

24   A. I don't recall.

25   Q. Okay. When you talked with Agent Fitzgerald at the

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

**Page 55**

```
 1   corner of Belmont and English on November 17, 2012,
 2   did you make a complaint to Agent Fitzgerald about
 3   Mark Holick?
 4   A    I don't recall.
 5   Q    Okay.  When you talked to Officer Hinner that day,
 6   November 17, 2012, did you complain about any
 7   individual involved in the protest activity?
 8   A    Well, they knew I was very unhappy about people
 9   being in my neighborhood and harassing me in my home
10   and my neighborhood.
11          MR. MCKINNEY:  Okay.  Again, that's
12   nonresponsive and I move to strike.
13   Q    I'm not asking you what the officers knew or what
14   you thought they knew.  I'm asking what you said.
15   Did you complain to Officer Hinner that day about
16   any individual protester?
17   A    I complained about the protest as a whole.
18   Q    Okay.  Did you make any complaint to Agent
19   Fitzgerald on November 17, 2012, about any
20   individual protester?
21   A    I complained about the protest as a whole.
22   Q    So when you spoke to the officers that day, you did
23   not single out any individual protester.  True?
24   A    I don't recall.  I don't believe so.
25   Q    Okay.  Now, let's take a look at Exhibit 3.  You
```

**Page 56**

```
 1   earlier, when you referenced this article --
 2   A    Mm-hmm.
 3   Q    -- you noted the statement attributed to Pastor
 4   Holick where he says, "There was a group of us that
 5   went." and then the word, "to Burkhart's home," is
 6   in parentheses.  True?
 7   A    Mm-hmm.
 8   Q    So do you know if those were his actual words, "to
 9   Burkhart's home," or if those were the words of the
10   reporter?
11   A    I don't -- I can't tell you that.  I don't know.
12   Q    Okay.  He said, "We had several signs.  One of the
13   signs did say that."
14          Okay.  Then the next sentence, it says, "He
15   said he had not been notified of the petition."  Is
16   it your understanding that's the petition you filed
17   for protection from stalking?
18   A    That was my understanding.
19   Q    Right.  Okay.  And if you look at this article, it
20   would have -- does it indicate to you it was posted
21   on the Web on Saturday, March 9, 2013?
22   A    Uh, that's the date.
23   Q    Okay.  And that would have appeared in the paper
24   Sunday, March 10, 2013, according to the upper
25   right-hand of the document?
```

**Page 57**

```
 1   A   Yeah.  According to that, yes.
 2   Q   Okay.  And the date this appeared to have been
 3       printed out at South Wind, looking at the top of the
 4       exhibit, would be March 11, 2013?
 5   A   Uh, yeah.  I guess so.  Yeah.
 6   Q   Okay.  So as a matter of fact, you had not even seen
 7       this article before you filed your protection from
 8       stalking order.  True?
 9   A   Um, I suppose not.  I guess not.
10   Q   Okay.  So whatever was attributed to Pastor Holick
11       in that article did not form a basis for your
12       petition for protection from stalking which you
13       filed on March 7, 2013.  True?
14   A   Could you restate the question?
15   Q   Okay.  Whatever was said in Exhibit 3, which has the
16       earliest date of March 9, 2013, could not have been
17       considered by you when you filed your petition for
18       protection from stalking --
19   A   Mm-hmm.
20   Q   -- on March 7th.  True?
21   A   True.
22   Q   Okay.
23   A   Yeah.
24   Q   Now, isn't it fair to say when you stopped and
25       talked to the officers on February 15 -- no, strike
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

**Page 58**

```
 1       that.  That was November.  Okay.
 2       Let's go back to Exhibit 1, Page 2.  Was your
 3       entire family absent from your home that day or
 4       during that protest?
 5   A   During which protest?
 6   Q   Incident number one.
 7   A   Yes.
 8   Q   Okay.  And during that event, which you say here --
 9       well, strike that.  I'll start all over.
10       You say here in Exhibit 1, Page 2, that
11       incident number one lasted from 11:30 a.m. to
12       1:30 p.m.
13   A   Correct.
14   Q   And you were only there for about five minutes?
15   A   Five or 10 minutes, yeah.
16   Q   Okay.
17   A   Mm-hmm.
18   Q   And isn't it true you didn't see anybody using the
19       bullhorn while you were there?
20   A   Uh, when I was there, I don't remember.  I know they
21       had a bullhorn.  I've seen the bullhorn on the tape,
22       though, being used.
23   Q   Okay.
24   A   And I heard from my neighbors.
25   Q   Okay.  You didn't mention the use of a bullhorn by
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

## Page 59

```
 1      Mark Holick as a basis --
 2  A   Hmm-mm.
 3  Q   -- for seeking this order against him in the
 4      incident of November 17th.  Right?
 5  A   No, it's not there.
 6  Q   Okay.  Are you telling me if I look at this tape,
 7      I'm going to see Mark Holick using a bullhorn?
 8  A   Um, yes, I believe you will.
 9  Q   Okay.
10  A   Mm-hmm.
11  Q   Now, after you state the time, you state, "picketing
12      at my house and my neighborhood."
13  A   Mm-hmm; correct.
14  Q   Those are your words; right?
15  A   Yes, those are my words.
16  Q   And is that on one of the reasons you seek the
17      protection from stalking order, because of picketing
18      at my house and my neighborhood?
19  A   I'm, uh, seeking the protection from stalking so
20      that I won't be harassed and intimidated and in fear
21      of my life when I'm in my neighborhood,
22      yeah, by anti-choice activists like Mr. Holick.
23  Q   But you didn't seek a protective order against all
24      the protesters, did you?
25  A   Against Mark Holick.
```

59

## Page 60

```
 1  Q   So you agree you did not seek a protective order
 2      against all the protesters?
 3  A   That's correct.
 4  Q   Okay.  You singled out Mark Holick because you
 5      understood him to be the leader of the protest
 6      activity?
 7  A   He is the leader of the protest activity and that's
 8      why, uh, he's singled out.
 9  Q   Okay.
10  A   Mm-hmm.
11  Q   Well, now back to my question.  Is picketing one of
12      the reasons you're seeking this or you sought this
13      order?
14  A   I primarily sought this order because there was a
15      death threat placed in front of my house on
16      February 15th, and I think everybody has the right
17      to live in their neighborhood without fear,
18      intimidation or harassment.
19  Q   Okay.  What was the death threat?
20  A   "Where's your church?"
21  Q   Okay.  So if I were to ask you today, "Where's your
22      church?" am I threatening you, your life?
23  A   It's the context.  They were there to harass and
24      intimidate me.  My former boss was murdered point
25      blank in his church and, uh, when I see that wordage
```

60

1  Q  -- tell the police your life had been threatened
2     when you called the --
3  A  Yeah, I don't remember if I saw that before or after
4     the police were there.
5  Q  Okay.  Is there any place in Exhibit 1 where you say
6     the sign, "Where's your church?" was a death threat?
7  A  Um, I say in point 5 that he's engaging in behavior
8     meant to scare and intimidate me.  He also uses
9     violent language, which I take very seriously.
10 Q  Well, that wasn't my question.  Is there anywhere in
11    Exhibit 1 where you say that the words, "Where's
12    your church?" was a death threat against you?
13 A  I didn't articulate it in that manner.
14 Q  Is there any place in Exhibit 1 where you
15    specifically complain about a death threat?
16 A  I did not state it in that manner.
17 Q  Okay.  And you said somebody put this sign in your
18    yard?
19 A  It was a sign that was there that day that they had,
20    and then at one point, it was also placed against
21    one of my trees.
22 Q  Who did that?
23 A  Hmm, I don't recall who placed it on the tree.
24 Q  And you said, "at one point."  When was that?
25 A  I don't -- I don't recall.

63

1  Q  Well, was it during incident number two?
2  A  Well, yes, it was during that time, so it was
3     sometime between 7:30 a.m. and 9:30 a.m.
4  Q  And where was this tree at?
5  A  In my front yard.
6  Q  Which side of the sidewalk?
7  A  Um, on the, uh, street side.
8  Q  So it was between the sidewalk and the street?
9  A  That's correct.
10 Q  But you don't know who put that sign there?
11 A  I didn't see who placed it there, no.
12 Q  Okay.  How long was it leaning against the tree?
13 A  As I said, I didn't really go to the window much,
14    because I was afraid that somebody might be -- try
15    to actually shoot me.
16 Q  Are you, uh, blaming Pastor Holick for putting that
17    sign against the tree?
18 A  Pastor Holick was working that day to incite
19    violence against me.  I saw the tree up -- the sign
20    up against the tree.
21          MR. MCKINNEY:  Okay.  That's -- I'm going
22    to object as nonresponsive and move to strike.
23 Q  In this legal matter, are you blaming Pastor Holick
24    for placing a sign against a tree between your
25    sidewalk and street that says, "Where's your

64

## Page 69

1  Q  Okay.  So the opinions you have given today are
2     based upon your own experiences and your own context
3     that you've lived in?
4  A  Correct; and what's happened at my home, yes.
5  Q  Okay.  And you don't know how the average person
6     would take a sign that says, "Where's your church?"
7        MR. EYE:  I'm going to object.  It calls
8     for the witness to speculate and it's a vague
9     question.  You may answer if you can.
10       THE WITNESS:  I, I don't know.
11       BY MR. McKINNEY:
12 Q  Now, if someone goes on TV and calls you a murderer
13    because you provide abortion services, is that an
14    incitement of violence?
15 A  I believe it is.
16 Q  Okay.  And again, you believe that to be true
17    because of your own personal experience in the
18    field?
19 A  Yes, and that this is a very volatile, politically
20    polarized volatile profession where we have
21    antagonists on the other side who only wish to harm
22    abortion providers.
23 Q  Now, I'll show you Exhibit 6.
24 A  Mm-hmm.
25 Q  You just referenced that.  What is it?

69

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

## Page 70

1  A  This is a flyer that was handed out in my
2     neighborhood in at least a, um, that I know of,
3     three-block radius.
4  Q  Is that the one you just referenced a moment ago,
5     where it said --
6  A  Mm-hmm.
7  Q  -- they handed out a flyer previously, which said
8     they should bring you to eternal life?
9  A  Mm-hmm.  That's correct.
10 Q  Okay.  When you said, "previously," when was that
11    flyer handed out?
12 A  Um, on the -- I believe it was the morning of
13    November 17th, 2012.
14 Q  So how do you know that?
15 A  Um, I had neighbors who called me telling me, uh,
16    about this.  I had a neighbor who mailed me a copy.
17    I had a neighbor who Facebooked me.  I had a
18    neighbor who drove by to tell me about this; um,
19    people who were quite concerned.
20 Q  Okay.  So do you regard Exhibit 6 as a death threat?
21 A  Yes.  I view it as being threatening and potentially
22    inciting people to violence.
23 Q  And in your opinion --
24 A  Mm-hmm.
25 Q  -- should Exhibit 6 be illegal?

70

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

1  MR. EYE: I'm going to object. It calls
2  for the witness to form a legal opinion, for which
3  she's not qualified.
4  MR. McKINNEY: It's not. I'm asking
5  about her personal opinion, as goes to her state of
6  mind. She's made claims in this case which
7  obviously relate to her state of mind.
8  MR. EYE: Same objection. You may
9  answer.
10  THE WITNESS: Okay. Well, I can tell you
11  that the wanted posters were banned, and so now the
12  anti-choice movement has moved to these wanted-style
13  posters. When the wanted posters were being
14  circulated, when somebody was murdered who was on
15  the list, they would cross that out online. These,
16  I -- are very similar to the wanted posters. This
17  is a wanted-style poster and, um, I believe that
18  yes, there are veiled death threats in this.
19  BY MR. McKINNEY:
20  Q  Okay. When you say "they," in your last answer, who
21  are you talking about?
22  A  Well, that would be Mark Holick, who's the pastor of
23  Spirit One Christian Ministries.
24  Q  He did what?
25  A  And his followers. Circulating this, uh, flyer in

1  my neighborhood.
2  Q  Well, a minute ago you were talking about wanted
3  posters that were banned and you said, "They cross
4  off names," and so on. You don't have any knowledge
5  that Mark Holick was involved in that, do you?
6  A  No, not in that.
7  Q  Okay.
8  A  But he's certainly the person who did this, so --
9  Q  Okay. So your answer, after all that you just told
10  me now, you think that Exhibit 6 is illegal or
11  should be illegal?
12  A  Well, it's got some veiled death threats, so --
13  Q  Okay. Is that a yes, it should be illegal because
14  it makes veiled death threats?
15  A  Yes.
16  Q  Okay.
17  A  Yes.
18  Q  Okay. What are the veiled death threats in Exhibit
19  6?
20  A  Um, "our actions could bring her to Jesus and
21  eternal life." Um, another one here is, "Abortion
22  will come to an end when Christians/the church of
23  Jesus Christ makes up her mind it will come to an
24  end and not one second sooner."
25  Q  Okay. Let me stop you on that one. Where is the

73

1    death threat in that?

2 A  Well, Mr. Holick here was talking about making up --

3    the Christians and the church of Jesus Christ making

4    up my mind for me, and I take that as a threat. If

5    you are making up somebody's mind for them --

6 Q  Okay.

7 A  -- that's a statement of force.

8 Q  Okay. So when you read the words, "When the church

9    of Jesus Christ makes up her mind" --

10 A  Mm-hmm.

11 Q  -- you don't see that as a reference to the church

12    as a "her"?

13 A  No, that's referencing me.

14 Q  Have you ever heard of the bride of Christ?

15 A  No.

16 Q  Have you ever heard Christians refer to the church

17    as "her"?

18 A  No.

19 Q  Okay. And so again, you're applying your own

20    understanding of those terms there; right?

21 A  Well, the subject of this flyer is not the church.

22    It was me, so I didn't think the church was the

23    subject.

24 Q  Of the sentence, it says, "Church of Jesus Christ

25    makes up her mind"?

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

---

74

1 A  Mm-hmm. No.

2 Q  Okay.

3 A  The subject wasn't the church. The subject was me.

4 Q  Are -- are you mentioned in that sentence?

5 A  No, but I'm the subject of this flyer.

6 Q  Okay. So is it possible that when you read this

7    flyer and you conclude it's a death threat, that you

8    might be a little more sensitive to the statements

9    in this flyer than the average person?

10       MR. EYE: Object. It's vague; calls for

11    the witness to speculate. You may answer.

12       THE WITNESS: No.

13 BY MR. McKINNEY:

14 Q  Okay. Are you telling me the average person, in

15    your mind, who reads this that says, "when the

16    church of Jesus Christ makes up her mind it will

17    come to an end," the average person will read that

18    as a death threat against you?

19       MR. EYE: Objection; vague. Calls for

20    the witness to speculate. You may answer.

21       THE WITNESS: I can't say.

22 BY MR. McKINNEY:

23 Q  Okay. But you regard that sentence as a death

24    threat?

25 A  It's a, it's a threatening sentence, and so is, "Our

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

77

```
 1        MR. McKINNEY:  Well, I'll object as
 2   nonresponsive.
 3   Q   Is it your own position in this case that it should
 4       be illegal for someone to preach that scripture,
 5       Proverbs 6:17, to an abortionist because it could
 6       incite violence?
 7   A   I guess it depends on the intent.
 8   Q   How do you discern the intent?
 9   A   Well, reading this?
10   Q   Exhibit 6.
11   A   The intent of this -- yeah, Exhibit 6.  The intent
12       is not -- it has violent undertones to it.
13   Q   That's how you see it; right?
14   A   That's correct.
15   Q   Okay.  Where Exhibit 6 says, "Pray for her
16       repentance and salvation through Jesus Christ," is
17       that threatening?
18   A   If you read certain sentences in this flyer and then
19       if you look at the flyer overall, and if you also
20       look at what has happened with, um, reproductive
21       health care providers and the fact that violence,
22       um, has unfortunately been rampant in this
23       profession.
24   Q   Would it be true that the fact that you are a
25       reproductive health care provider makes you look at
```

78

```
 1       Exhibit 6 a little differently than most people?
 2           MR. EYE:  I'm going to object.  It's
 3       vague; calls for the witness to speculate.  You may
 4       answer if you can.
 5           THE WITNESS:  Yeah, I don't know.  The
 6       reality is is that providers have been murdered and
 7       harassed and vandalized and intimidated.
 8   BY MR. McKINNEY:
 9   Q   And that makes you look at Exhibit 6 a little
10       differently than most people would look at it?
11           MR. EYE:  Same objection.
12           THE WITNESS:  Maybe.  I don't know.
13   BY MR. McKINNEY:
14   Q   Okay.  Well, I'm not sure you answered my question.
15       Do you see this phrase here, "Adopt Julie Burkhart
16       and pray for her repentance and salvation through
17       Jesus Christ," as some kind of threat of violence?
18   A   Well, I did not specifically say that that isolated
19       sentence was violent or had violent undertones,
20       necessarily.
21   Q   Okay.  Well, what about the next sentence, "Recruit
22       other loving Christians to join you in prayer for
23       her."  Does that have violent implications to you?
24   A   If you look at this flyer overall --
25   Q   I'm asking you about this sentence.
```

Page 101:

```
 1        video of Mark Holick taken at your workplace?
 2   A    Yes.
 3   Q    Okay.  And what date was that video taken?
 4   A    I don't have a specific date.
 5   Q    Okay.  Where is that video?
 6   A    Um, it would have to be pulled off the camera
 7        system.  I don't -- I don't have a copy.
 8   Q    Can you do that?
 9   A    Um, sure.
10             MR. McKINNEY:  You guys mind producing
11        that?
12             MR. EYE:  We can do that.
13        BY MR. McKINNEY:
14   Q    What's he doing on that video at your workplace?
15   A    Uh, out protesting; walking the perimeter of the,
16        um, property; looking like he's scoping it out for
17        something.
18   Q    Okay.  Uh, when did the police come to you before
19        the first incident of November 17, 2012, and tell
20        you it was going to take place?
21   A    Oh, I don't know.  Maybe one week, two weeks
22        beforehand.  Uh, I don't know.  I don't, I don't
23        remember exactly.
24   Q    Who contacted you?
25   A    Um, I -- Officer Hinner.
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

101

Page 102:

```
 1   Q    What did he tell you?
 2   A    Uh, that Spirit One and Mark Holick were going to
 3        have a protest in my neighborhood at my house.
 4   Q    Did he specifically identify that group?
 5   A    Uh, yes.
 6   Q    Did he mention anyone else?
 7   A    Uh, he specified Mark Holick.
 8   Q    Did he mention anyone else?
 9   A    Um, I don't remember.  He might have mentioned John
10        Pride, but I don't remember.
11   Q    Do you know if Mr. Schoch, when he took the video in
12        Exhibit 2, tried to get all the protesters that were
13        there onto this video at some point?
14   A    Um, he was trying to get all the protesters who were
15        in, in front of my house.  I don't know if he got
16        the protesters that were down on the corner of
17        English and Belmont and then the protesters up on
18        Douglas and, uh, Belmont.  I don't know if he got
19        those protesters on tape.
20   Q    Okay.  So the event on November 17, 2012, there was
21        one group of protesters at Douglas and Belmont.
22        True?
23   A    Well, there was a group of protesters and they
24        spread out at various times to form three groups,
25        was my understanding.
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

102

103

```
 1   Q   Right.  And one of those groups was at Belmont and
 2       Douglas?
 3   A   Mm-hmm.  Yep, because I had people telling me they
 4       were driving by, seeing their signs.
 5   Q   And one group was at, what, Belmont and English?
 6   A   Yes.
 7   Q   And then one group was in front of your house?
 8   A   Yes, uh-huh.
 9   Q   Okay.
10   A   Yep.
11   Q   Do you know which group Mr. Holick was in?
12   A   Well, he was in the big group that came to my house.
13   Q   Well, which one of the three groups you just told me
14       about was he in that day?
15   A   Well, he was there protesting in my neighborhood, at
16       my house.  I don't know which group he dispersed
17       into.
18   Q   Okay.  When you say, "at my house," what do you
19       mean?
20   A   In front of my house.
21   Q   So you're testifying under oath today that Mark
22       Holick, on November 17, 2012, engaged in a protest
23       directly in front of your house?
24   A   He was leading a protest at my house and in my
25       neighborhood.
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

104

```
 1   Q   That's not what I asked you, so object and move to
 2       strike.
 3           Are you testifying today under oath that Mark
 4       Holick was protesting directly in front of your
 5       house on November 17, 2012?
 6   A   I believe he was in front of my house.
 7   Q   Okay.  And what's that belief based on?
 8   A   The fact that Mark Holick was leading a group of
 9       Spirit One parishioners to come to my house to
10       harass and intimidate me and to coerce my neighbors
11       into, um, I guess forcing me to move out of my
12       neighborhood, I don't know.  Um, so it's based on
13       that belief that he was wanting to come to my
14       neighborhood to harass me.
15   Q   Anything else?
16   A   No, hmm-mm.
17   Q   Was it your understanding that the police were
18       present during the entire event of November 17,
19       2012?
20   A   I believe they were.
21   Q   Uh, to your knowledge, did the police make any
22       arrests?
23   A   They did not, but they were at my -- in my
24       neighborhood and watching the antis because they
25       were afraid of some, uh, that something might
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

105

1  happen.  They were being very cautious.
2  Q  Who was afraid that something might happen?
3  A  Law enforcement.
4  Q  Is that what they told you?
5  A  They were going to come to my neighborhood and watch
6     the actions of the protesters.
7  Q  Is that what they told you?
8  A  In order to help ensure my safety.
9  Q  Is that what they told you?
10 A  That's what was conveyed to me when they told me
11    that Spirit One, led by Mark Holick, was going to be
12    coming into my neighborhood.  They wanted to be able
13    to be there to watch them, to make sure that
14    everything was peaceful.
15 Q  And who told you that?
16 A  Uh, Officer Hinner.
17 Q  Do you know of any acts of violence that occurred in
18    the first incident on November 17, 2012?
19 A  No, but then once again, law enforcement was there
20    in my neighborhood.
21        MR. McKINNEY:  Okay.  I'm going to object
22    to the volunteered and argumentative portion of the
23    answer and move to strike.
24 Q  Okay.  In incident one, Exhibit 1, Page 2, you say,
25    "They were picketing at my house."  What do you mean

106

1  by "at my house" in that statement?
2  A  In front of my house.
3  Q  On the sidewalk?
4  A  Yes.
5  Q  It's true no protesters actually entered your house;
6     right?
7  A  No.
8  Q  Is that right?
9  A  Right.  I said no.
10        MR. EYE:  No, they did not enter your
11    house; but yes, you agree with his statement that
12    they didn't.  Right?
13        THE WITNESS:  Mm-hmm.
14 BY MR. McKINNEY:
15 Q  Okay.  And, uh, you don't have any evidence that any
16    protesters were on your private property on
17    November 17, 2012, do you?
18 A  Hmm, not to my knowledge.
19 Q  So when you use the phrase, "in front of my house,"
20    on Page 2 of Exhibit 1, you're talking about the
21    public sidewalk in front of your house?
22 A  Right, which I think most people consider to be in
23    front of their house.
24 Q  Okay.  And again, I'm
25    going to object to the volunteered arguments and

1   move to strike.
2   Q   Did you know that the police had visited with the
3       protest group before the event started on
4       November 17, 2012?
5               MR. EYE: Object. Asked and answered
6       this morning, but you may answer.
7               THE WITNESS: Yes.
8   BY MR. MCKINNEY:
9   Q   Do you know what instructions the group was given
10      before the incident on November 17, 2012?
11  A   Hmm, no.
12  Q   How far back is your house from the sidewalk?
13  A   Oh, I don't know.
14  Q   Okay. Let's say you pulled your car in and you
15      parked it with the nose of your car even with the
16      first wall of your house. You could probably get
17      another car behind that and not be blocking the
18      sidewalk. True?
19  A   Probably. Yeah, mm-hmm.
20  Q   What about three cars?
21  A   Oh, I don't know. Um, well, might be more like two
22      cars.
23  Q   Your house is some distance back from the street?
24  A   Hmm, no.
25              MR. EYE: Objection; vague. Some

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

---

1   distance?
2               MR. MCKINNEY: Well, I'm going to follow
3       up.
4               MR. EYE: Okay.
5               THE WITNESS: Hmm-mm.
6   BY MR. MCKINNEY:
7   Q   How far back from the street is your house?
8               MR. EYE: Objection. She asked -- that
9       was asked and she said she didn't know, Counsel.
10              MR. MCKINNEY: No, that was the sidewalk.
11      Look it up.
12              MR. EYE: Fair enough. You may answer.
13              THE WITNESS: Okay. What's the question?
14  BY MR. MCKINNEY:
15  Q   How far back from the street is your house?
16  A   I don't know. Maybe if you were measuring by car
17      lengths, maybe two car lengths. I have a pretty
18      small front yard.
19  Q   Have you ever personally seen Mark Holick even
20      within 100 yards of your house?
21  A   He, um, was at my house, uh, during those protests.
22              MR. MCKINNEY: Okay. Again, I'm going to
23      object as nonresponsive and move to strike.
24  Q   Have you ever seen Pastor Holick within 100 yards of
25      your house?

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

109

1  A  Well, it would have been when I glanced out the
2     window on that second occasion on February 15th of
3     '13.
4  Q  And saw what?
5  A  What looked like Mark Holick.
6  Q  What made you think it was him?
7  A  Uh, because he had the build of Mark Holick. He was
8     leading the protest to my house.
9  Q  What was his build?
10 A  Oh, uh, short hair, kind of balding on top. Maybe
11    fifties, sixties, I don't know. Uh, tallish, fairly
12    slender, Caucasian.
13 Q  And when you say, "He was leading the protest," what
14    was he doing?
15 A  Well, he's the one who orchestrated and led the
16    protesters to my house on that day to protest once
17    again in my neighborhood.
18 Q  No. My question is: When you glanced out the
19    window, you said you thought it was Mark Holick
20    because he was leading the protest.
21 A  Mm-hmm.
22 Q  What was he doing at the time you glanced out the
23    window --
24 A  There on my --
25 Q  -- that made you think he was leading the protest?

---

110

1  A  Oh, he was there on my sidewalk, there in front of
2     my house.
3  Q  With several other people; right?
4  A  There was, yeah, there was some other people.
5  Q  So what made you think, when you glanced out the
6     window, that he was leading the protest?
7  A  Because I knew that Spirit One Ministries, which he
8     is the head of, uh, led the first protest; and it
9     was clear to me that they were back for a second
10    protest in my neighborhood in front of my house.
11 Q  Now, you told us earlier you were afraid to get too
12    close to the windows?
13 A  Mm-hmm.
14 Q  In February?
15 A  Mm-hmm. That's when I glanced out the window and I
16    saw what was going on. I saw the sign and I was
17    like, I better not go back to that window because
18    somebody might be wanting to shoot me on that day.
19       MR. McKINNEY:  Okay. Again, I'm going to
20    object to the volunteered argumentive answers that
21    are nonresponsive to the question and move to
22    strike.
23 Q  Was that a yes, you said uh-huh, that on
24    February 15, you were afraid to get too close to the
25    windows when you knew there were protesters out

1 there?

2 A  Yes; that's correct.

3 Q  So your glance was a very brief glance?

4     MR. EYE:  Object to the form.  States --

5     misstates what she said, but you may answer.

6     THE WITNESS:  Um, I looked long enough to

7     know what was going on out, outside.

8 BY MR. McKINNEY:

9 Q  So how long was your glance?

10 A  I can't say.

11 Q  In any event, it was a glance.  No question about

12     that?

13 A  I looked out the window.

14 Q  What was the closest any protester got to your

15     house?

16 A  Um, I believe they were on the sidewalk.

17 Q  And you don't know that distance?

18 A  No.

19 Q  What would be your best estimate?

20 A  I don't know.  I'd have to get out a tape measure

21     and mark it off with my feet.

22 Q  Did you have a big sign in your yard?

23 A  They had a sign there that day that said, "Where's

24     your church?"

25 Q  No, I'm talking about November 17, 2012.

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

111

---

1 A  Oh.

2 Q  Was there a big sign in your yard?

3 A  No.

4 Q  That you put there?

5 A  No.

6 Q  Did you ever put a sign in your yard?

7 A  A sign in my yard?  Um, no.

8 Q  Okay.  Okay.  We're back to Exhibit 1, incident

9     number one.  The next thing you say is, "handed out

10     a wanted-style flyer about me."

11     Okay.  You didn't actually see Mark Holick do

12     that, did you?

13 A  No, and I already answered that.

14 Q  And you said they had posters, or it doesn't say

15     who, but it says, 'had posters with inflammatory

16     language."  That's what you put there in incident

17     number one in Exhibit 1; right?

18 A  Uh, yeah.

19 Q  Okay.  What was the -- what did you mean by

20     inflammatory language?

21 A  Well, calling me a, uh, murderer; having grotesque

22     photos of supposedly aborted fetuses; asking me

23     where's my church; um --

24 Q  Okay.  Again, I'm talking about the first incident,

25     November 17, 2012.  Did they have a sign at that

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

112

1   time that said, "Where is your church?"
2 A  They didn't have a Where's Your Church sign that
3   time, that I'm aware of.
4 Q  Okay.  Did they have a poster that mentioned you by
5   name?  You said, "They were calling me a murderer on
6   their signs."
7 A  Well, this calls me a murderer and, um, they --
8       MR. EYE:  You're referring to Exhibit --
9       THE WITNESS:  Exhibit 6.
10      MR. McKINNEY:  Okay.
11      THE WITNESS:  And they had other signs,
12   oh, that said like abortionist, killer.  I don't
13   know.  Just I can't remember the exact language.
14 BY MR. McKINNEY:
15 Q  Okay.  I'm not asking about Exhibit 6 now.  We
16   already covered that.  I'm asking you about incident
17   number one on your petition you filled out.  You
18   said they, quote, had posters with inflammatory
19   language.
20      I'm asking you now, what did you mean by
21   inflammatory language?
22 A  And I thought I just answered that, in that they
23   had, um, signs that called -- said abortionist,
24   killer on their signs; grotesque photos; um, words
25   and images meant to shock people and, uh, incite

113

1   people to violence.
2 Q  Okay.  Can we first agree that none of the signs
3   mentioned you by name?
4 A  I don't -- I don't know.
5 Q  You didn't see that, did you?
6 A  I didn't see any, no.
7 Q  Okay.  And, uh, are you saying they said something
8   about abortionists are killers?
9 A  Yeah, something like that.
10 Q  What was the language?
11 A  I don't remember exactly.
12 Q  Okay.  And you specifically remember seeing that,
13   that day, November, 2012, or could you be confusing
14   it with other things you've seen?
15 A  No, I saw it on that day.
16 Q  Okay.  Uh, what other language did you think was
17   inflammatory on the posters in the first incident?
18 A  I can't say.
19 Q  Okay.  When you say, "inflammatory," what does that
20   word mean in your usage?
21 A  Well, if it's inflammatory, it's meant to shock
22   people.  It's meant to make people angry.  It's
23   meant to invoke some sort of an emotional response
24   from people.
25 Q  Is that illegal?

114

115

```
 1            MR. EYE:  Objection.  Calls for a legal
 2  conclusion, but you may answer it if you can.
 3            THE WITNESS:  I don't know.
 4  BY MR. McKINNEY:
 5  Q   Did you complain to the police about any specific
 6      poster in use on November 17, 2012?
 7  A   Mmm, I don't know.  Maybe.  I know that I had
 8      discussions with law enforcement afterwards.
 9  Q   And what were these grotesque photos you're talking
10      about?
11  A   What?  I don't --
12            MR. EYE:  I think he's referring to the
13  grotesque photos at the demonstration.
14            THE WITNESS:  Oh, they -- oh, okay.
15  Those were on, you know, some of the, um, placards,
16  billboards that they had brought to my neighborhood,
17  if that's what you mean.
18  BY MR. McKINNEY:
19  Q   Yeah.  I mean what, what were they?
20  A   Uh, supposedly aborted fetuses.
21  Q   And is your position that by holding posters with
22      inflammatory language, you were being stalked?
23  A   I think when people come into one's neighborhood,
24      like they did with my neighborhood, and stand
25      outside my home and yell things and hold up signs
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

116

```
 1  with inflammatory language, I think that yes, that's
 2  stalking.
 3  Q   Okay.  And you're talking about several people
 4      there, aren't you?
 5  A   Well, the leader of that group is Mark Holick.
 6  Q   I didn't ask you that.  In your last answer, weren't
 7      you referring to several people?
 8  A   There were parishioners from Spirit One Ministries
 9      who had joined him in that protest.
10  Q   How do you know that the people in that protest were
11      parishioners from Spirit One?
12  A   Well, maybe they weren't.  Maybe they were just his
13      followers.
14  Q   Okay.  A minute ago, you said, "When people come
15      into my neighborhood and hold up these signs, I call
16      that stalking."  You're talking about a group of
17      people, aren't you?
18  A   There were a group of people in my neighborhood, led
19      by Mark Holick, who came in specifically to harass
20      me and intimidate me because they don't believe
21      philosophically in what I do; and so they came into
22      my neighborhood, led by Mr. Holick, um, to threaten
23      me and harass me and intimidate me.
24            MR. McKINNEY:  You know, if we keep
25      having speeches on every question, we're going to be
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

117

```
 1   here more than one day, and I object as
 2   nonresponsive.
 3   Q   I asked you a simple yes or no question:  Weren't
 4   you talking about a group of people?  And you've
 5   given me a long speech about all these people doing
 6   these horrible things to you.  Can we just keep it
 7   simple?  Aren't you talking about a group of people
 8   in incident number one?
 9   A   I said yes, there's a group.  There were a group of
10   people there.
11   Q   How many?
12   A   I, I don't know.
13   Q   Let me ask you a few questions about incident number
14   two.  In Exhibit 1 on Page 2, you say on
15   February 15, 2013 -- well, I need to back up.
16       Back on incident number one where you say,
17   "had posters with inflammatory language," um, did
18   you see Pastor Holick holding such a poster that
19   day?
20   A   Uh, I -- he might have been.  I don't know.
21   Q   Okay.  Now, incident number two where you say,
22   quote, pointed a sign towards my house.
23       Who pointed a sign towards your house that day
24   that said, "Where's your church?"
25   A   I can't say for sure who turned it towards my house.
```

118

```
 1   Q   Okay.  When you say, "pointed a sign towards my
 2   house."  What do you mean by that phrase?
 3   A   It means that the sign had been turned around to
 4   face my house so if somebody were inside the house,
 5   they would read, "Where's your church?"
 6   Q   Okay.  And isn't it true that various times, they
 7   pointed their signs in different directions, at that
 8   incident?
 9   A   I can't say.
10   Q   Did you ever see them pointing their signs outward
11   towards the street during incident number two?
12   A   Mmm, maybe, yeah.
13   Q   I guess based -- your knowledge of what was taking
14   place outside your house during incident number two
15   was based on, number one, a glance, and number two,
16   what you heard.  True?
17            THE REPORTER:  And number two, what?  I'm
18   sorry.
19            MR. McKINNEY:  What you heard.
20            THE WITNESS:  Can you repeat that?
21            MR. McKINNEY:  Can you read that back,
22   please?
23            (The preceding question was read
24   back by the Reporter.)
25            THE WITNESS:  No.
```

119

BY MR. McKINNEY:

2  Q  What else?

3  A  My knowledge of incident number two was what I saw

4  during incident number two, and the fact that

5  those -- well, same folks as incident one. It was

6  just round two.

7  Q  Okay. So help me out here. Correct my impression.

8  A  I thought you told us that you made a brief glance

9  out the window and then you stayed away from the

10  window during incident number two.

11  A  I looked outside the window; I saw who was outside;

12  and I decided that I wanted to stay back from the

13  window because I feared for my safety.

14  Q  Okay. So your knowledge of what occurred during

15  incident number two was based upon your glance out

16  the window, what you heard with your ears, and what

17  you knew about incident number one and it was the

18  same people?

19  A  Correct.

20  Q  Okay. Anything else? Did you look at any photos or

21  videos taken during incident number two?

22  A  No.

23  Q  Okay. Anything else?

24  A  No.

25  Q  Next, you talked about your former boss was

120

1  murdered in his church. That would be George

2  Tiller; right?

3  A  That's correct.

4  Q  Okay. I may come back to that later. Then you say

5  under incident number two, quote, used a bullhorn or

6  way to magnify volume.

7  A  Mm-hmm.

8  Q  Close quote. Okay. Are you -- are you referring to

9  Pastor Holick there in that phrase, or are you just

10  referring in general to someone in the crowd?

11  A  I believe he was on the bullhorn.

12  Q  That was the impression you had when you glanced out

13  there; right?

14  A  That was my impression. That's my understanding.

15  Q  Okay. And is there something different between your

16  impression and the understanding? Is there

17  additional information that leads to your

18  understanding?

19  A  He was the leader of the group as well, but no. No.

20  Q  Okay. Or did the police identify any illegal

21  activity during the second incident?

22  A  Um, my neighbors and myself were disrupted because

23  of the yelling on the bullhorn.

24  Q  And you called the police and complained about that;

25  right?

121

```
 1   A.   Mm-hmm.  I called 911.
 2   Q.   Somewhere we have your report as an exhibit.  It
 3        looks like it might be Exhibit 2.  Do you have that
 4        in your stack?  Exhibit 5.
 5   A.   Mm-hmm.
 6   Q.   Is this the report you made to the police?
 7   A.   It looks like it.
 8   Q.   On February 15, 2013?
 9   A.   Yes, it looks like it.
10   Q.   Okay.  Now, at the top of this exhibit, it shows a
11        date of March 7, 2013.  Did you go to the police and
12        request this report?
13   A.   Hmm, I don't remember.
14   Q.   Before you filed your petition?
15   A.   Hmm, I don't remember.
16   Q.   Okay.  Now, isn't it true that the report you made
17        to the police on February 15, 2013 was about two
18        people?
19   A.   No.
20   Q.   Okay.  Where did the police get the name John Pride
21        as a suspect, as indicated on the first page of
22        Exhibit 5?
23   A.   I complained about the people out front -- out in
24        front of my house.
25   Q.   Did you complain about the people on the bullhorn,
```

122

```
 1   A.   as you just told us --
 2   Q.   Mm-hmm.
 3        -- disturbing your neighborhood?
 4   A.   Mm-hmm, yes.
 5   Q.   Did you complain about two people on the bullhorn?
 6   A.   Mm-hmm, yes.
 7        Mmm, I don't remember complaining about specifically
 8        these people.  I might have mentioned them, but I
 9        don't -- no, I don't know.
10             (Burkhart Deposition Exhibit No. 7
11             marked for identification.)
12   BY MR. McKINNEY:
13   Q.   I'll show you what's been marked as Exhibit 7.
14   A.   Mm-hmm.
15   Q.   You see this?  It's a public incident report from
16        the Wichita Police Department and it's the same
17        date, February 15, 2013.
18   A.   Mm-hmm.
19   Q.   About 7:40.  That's at the same time as your
20        incident report that you brought, Exhibit 5; right?
21   A.   7:40 --
22   Q.   Mm-hmm.  That looks like it.
23        -- February 15th, 2013.  Okay.  And you see it says,
24        *Summary: V1 reports S1 and S2 disturbing her peace
25        by yelling outside her residence."  You see that?
     A.   Oh, right there, yeah.
```

1  Q  Is that what happened or is the police report wrong?

2  A  Well, I called 911; said there were people outside.

3     I don't remember exactly what I said when I called,

4     so yeah, I don't know.

5  Q  And two police officers came?

6  A  Mm-hmm.

7  Q  And they came into your house?

8  A  Mm-hmm; correct.

9  Q  And did they ask you to point out who was disturbing

10    the peace?

11 A  To point out? Uh, no, because I never looked

12    outside when the police were there.

13 Q  Well, how did the police get the -- conclude that

14    you had reported Suspect 1 and 2 disturbing your

15    peace?

16        MR. EYE:  I'm going to object.  I don't

17    think that's what it says.

18        MR. McKINNEY:  That's exactly what it

19    says.  Exhibit 7.

20        MR. EYE:  Oh, I'm sorry.  I was looking

21    at the wrong one.

22        THE WITNESS:  I don't know.  I mean, I

23    might have mentioned their names.  I don't, I don't

24    remember.  I was, I was quite upset because there

25    were people outside in front of my house protesting,

123

---

1     and I called 911.  I don't remember exactly what I

2     said to them, um, yeah.

3  BY MR. McKINNEY:

4  Q  Okay.  Would it be true that the incident report,

5     Exhibit 5, does not mention Mark Holick as a

6     suspect?

7        MR. EYE:  The, the document speaks for

8     itself, but you may answer.

9        THE WITNESS:  Well, I don't see Mark

10    Holick's name on this.

11 BY MR. McKINNEY:

12 Q  Okay.  And if you look on the third page of Exhibit

13    5, you see where it says, "Victim 1/Burkhart reports

14    S1/Pride and S2/Heald disturbing her peace by

15    yelling outside her residence."  You see that?

16 A  I see that.

17 Q  Now, is Exhibit 5 incorrect in making that

18    statement, or is that what happened?

19 A  Um, well, they -- I guess they were there.  That's

20    what this document shows --

21 Q  Who --

22 A  But that doesn't mean that nobody else was there.

23 Q  Who was there?  You guess who was there?

24 A  Well, this -- the names on this report are Nicholas

25    Heald and John Pride.

124

**129**

```
 1              MR. McKINNEY:  I'm correcting the
 2    witness.  Okay?
 3              MR. EYE:  Ask questions.
 4    BY MR. McKINNEY:
 5    Q    On February 15, 2013, when the police came to your
 6         house during that incident, you have no memory of
 7         mentioning the name Mark Holick to the police.
 8         True?
 9              MR. EYE:  Asked and answered.  You may
10    answer.
11              THE WITNESS:  I, I don't remember.
12    BY MR. McKINNEY:
13    Q    Does that mean you don't remember mentioning Mark
14         Holick or you don't remember what memories you have?
15    A    Once again, I knew he was there leading that group.
16         I don't remember exactly what I said verbatim to the
17         police officers.
18    Q    Okay.  And when you say, "I knew he was there
19         leading the group," exactly where was he leading the
20         group, in your answer?
21    A    Well, as I've stated previously, he was in front of
22         my house protesting, in my neighborhood.
23    Q    Where was he in your neighborhood?
24    A    In front of my house.
25    Q    How far in front of your house?
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

**130**

```
 1              MR. EYE:  Objection; asked and answered.
 2              THE WITNESS:  Sir, I don't remember.  I
 3         don't know.
 4    BY MR. McKINNEY:
 5    Q    Okay.  On -- okay.  Could he have been down at
 6         Douglas and Belmont to lead that protest?
 7    A    On that day --
 8    Q    On February 15th?
 9    A    -- on February 15th, I believe he was directly in
10         front of my house.
11    Q    Based on what you already told us; right?
12    A    Based on what I saw outside my house.
13    Q    At that incident, the second one, on February 15th,
14         did the protesters also occupy three locations,
15         being up at Douglas and Belmont, and at your house,
16         and down at English and Belmont?
17    A    I don't know, as I was cornered in my house because
18         protesters were outside.
19    Q    So for the same reason, you wouldn't know which of
20         those three locations Mr. Holick was at?
21    A    No, because I didn't think it was safe to go
22         outside.
23    Q    So you agree with what I just said?
24    A    Sure, mm-hmm.
25    Q    So after you spoke to the police in your home on
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

## 137

```
 1              MR. EYE:  That -- I'm going to object to
 2   that.  That's none of your business.
 3              MR. McKINNEY:  You don't think that's
 4   discoverable?
 5              MR. EYE:  I do not -- I am objecting.  I
 6   am directing you not to answer.  That's an
 7   attorney-client privileged matter.
 8   BY MR. McKINNEY:
 9   Q   Would you agree that other people could see a sign
10       that says, "Where is your church?" and reasonably
11       not make the same associations you make with such a
12       sign?
13              MR. EYE:  Asked and answered.  I think
14   you can go ahead and answer it if you can.
15              THE WITNESS:  Well, okay.  I thought I
16   had, but --
17              MR. McKINNEY:  You want to hear it back?
18              THE WITNESS:  Yes.
19              (The preceding question was read
20              back by the Reporter.)
21              MR. EYE:  I'll object again.  Asked and
22   answered.  You may answer.
23              THE WITNESS:  Yes, if their boss hadn't
24   been murdered in their church.
25   BY MR. McKINNEY:
```

## 138

```
 1   Q   Is it true that a sign that says, "Where is your
 2       church?" could reasonably have nonviolent meanings
 3       to others?
 4   A   Yes, if it was affiliated with another subject
 5       matter or movement, potentially, yes.
 6   Q   On its face, the language of that sign, "Where is
 7       your church?" does not mention violence, does it?
 8   A   No, when it's isolated on its own; but given the
 9       context, it can have violent undertones.
10   Q   And that sign, "Where's your church?" does not
11       mention a violent act, does it?
12   A   No, but not all violent acts have to be explicitly
13       mentioned.
14   Q   So that sign, "Where is your church?" is not violent
15       until you put it into a particular context.  Agreed?
16   A   Correct; which me having abortion clinic protesters
17       outside my house put it right into that realm.
18              MR. McKINNEY:  Again, I'll object to the
19       volunteered portion of the answer and move to
20       strike.
21   Q   Do you know of any violent acts that occurred during
22       the second outreach?
23   A   No.
24   Q   Do you know of any violence ever committed by Mark
25       Holick?
```

1   A   Uh, I know he was arrested at the Summer of Mercy
2       Renewal where they came to finish the job in 2001.
3   Q   How do you know that?
4   A   I saw him being arrested.
5   Q   Where at?
6   A   At the corner of Kellogg and Bleckley, outside of
7       Dr. Tiller's clinic.
8   Q   Who was he with?
9   A   Oh, he was with two other people. They arrested
10      three people and he was one of the people.
11  Q   What were they arrested for?
12  A   I don't remember exactly.
13  Q   So here's my question: Do you know of any acts of
14      violence -- and I'll move to strike all of that,
15      because it's nonresponsive.
16          My question was: Do you know of any acts of
17      violence by Pastor Holick?
18  A   Well, I don't know. I saw him being arrested, which
19      I don't know if that was an act of violence or not,
20      but I did witness him being arrested.
21          MR. McKINNEY:  Okay.  And again, I'll
22      have to strike that.  Object, nonresponsive.  Move
23      to strike.
24  Q   I'm not asking for something you don't know. I'm
25      asking you, do you know of any acts of violence by

139

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

1   Mark Holick?
2   A   I don't know.  I thought that maybe -- no, I don't
3       know.
4   Q   Okay.  Do you know of any acts of violence by Pastor
5       Holick at any of these incidents mentioned in
6       Exhibit 1, your petition for protection from
7       stalking?
8   A   No.
9   Q   Do you know of any acts of violence by any of these
10      people in general that you are complaining about in
11      your petition, Exhibit 1?
12  A   No.
13  Q   How many people were involved in the second
14      incident, February, 2013?
15  A   I had stated that I don't know.
16  Q   All right.  Let's go to the third incident, Exhibit
17      1, on Page 2 of that exhibit.  You say January of
18      2013, Mark Holick was at your place of business.
19  A   Mm-hmm.  It would have been, yeah.
20  Q   Do you have the date for that?
21  A   No, I don't.
22  Q   Okay.  And you say he was standing in the middle of
23      the driveway with John Pride.
24  A   Mm-hmm.
25  Q   Is that yes?

140

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

THE WITNESS:  Not necessarily.  I'd have
to go back and look.

BY MR. McKINNEY:

Q.  Okay.  But you're telling me there is one of the
incident you mentioned in your petition, Exhibit 1?

A.  Correct.

Q.  Okay.  How long is that video?

A.  I don't know.

Q.  Okay.  And you state here in your petition he's
standing in the middle of the drive; right?

A.  Mm-hmm.

Q.  How long did he stand in the middle of the drive?

A.  I don't know.

Q.  Now, you've been in this business a long time.  You
know that if they stand in the drive and block
traffic, they can be arrested; right?

A.  Mm-hmm.  Yes.

Q.  So in any event, you didn't -- Mr. Holick wasn't
there long enough for you to call the police, was
he?

MR. EYE:  I'm going to object, vague; but
you can answer if you can.

THE WITNESS:  Yeah, I don't know.  I
can't say whether the police were called or not.

BY MR. McKINNEY:

143

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

---

Q.  Who would have called the police if they were called
on that incident in January of 2013?  Would that be
you?

A.  Uh, potentially, or it could have been some other
people at my office.

Q.  Who else had that authority?

A.  Um, our operations director.

Q.  Who's that?

A.  Molly Rattler.

Q.  Anybody else who could have called the police on
Mark Holick in January of 2013 at your clinic?

A.  Um, well, my staff has been instructed that if
there's, um, something going on at the clinic and
they feel that their safety is, uh, of concern or
anybody else's safety, that anybody can call 911; so
yeah, I -- it's a -- and I can't, I don't even
remember who was at the office at that time.

Q.  Would it be fair to say that by January of 2013,
there had been thousands of people at one time or
another who have stood in the middle of the driveway
at that clinic?

A.  Oh, I don't know.

Q.  Well, let me ask you like this:  Can we agree that
before January of 2013, there had been thousands of
people who had protested at that clinic before?

144

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

**145**

```
 1    A    Uh, yes, mm-hmm.
 2    Q    And isn't it common during protests to see people
 3         walk around the perimeter of the clinic, back and
 4         forth?
 5    A    Some people might do that.
 6    Q    Might?  Haven't you seen that?
 7    A    Mm-hmm.  I know Mr. Holick did that.
 8    Q    And you've seen a lot of other people do that;
 9         right?
10    A    Uh, some people.
11    Q    Approximately how many?
12    A    Hmm, oh since, uh, buying the clinic --
13    Q    I'm not asking that.
14    A    -- maybe five or six.
15    Q    I'm asking your entire experience at that clinic.
16    A    Um, I, I can't say.
17    Q    You can't give me any kind of estimate?
18    A    No.
19    Q    Of how many people have walked across that drive,
20         standing in it?
21    A    No.
22    Q    For any length of time?
23    A    Hmm-mm.  No.
24    Q    Okay.  When you say, "in the middle of the
25         driveway," what do you mean?
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

**146**

```
 1    A    He was standing right there in the middle of the
 2         driveway.
 3    Q    That's outside the wall; right?
 4    A    Uh, it's outside the gate, mm-hmm.
 5    Q    Okay.  That's -- he was standing where the sidewalk
 6         crosses the driveway?
 7    A    Mm-hmm; correct.
 8    Q    The public sidewalk?
 9    A    He was standing right there in the middle of the
10         drive, as you come into the property.
11    Q    Where the public sidewalk crosses the driveway?
12    A    Correct.
13    Q    He never did enter the premises, did he?
14    A    No.
15    Q    And you don't know how long he stood there; right?
16    A    I'm not sure.
17    Q    You didn't see any evidence that he blocked traffic,
18         did you?
19    A    I don't believe he did, but once again, I'm not
20         sure.  I'd have to look at the tape.
21    Q    You have no knowledge of any complaint being made to
22         the police about this incident in January of 2013.
23         True?
24    A    Hmm, I'm not sure, yeah.
25    Q    When you say you're not sure, does that mean you
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

**147**

1  have, you may have --
2  A   I'm not sure if the police were called or not.
3      I'm --
4  Q   Okay.  As you sit here testifying today, what
5      knowledge do you have of the police being called in
6      January of 2013 because Mark Holick was standing in
7      the driveway where the sidewalk goes across it?
8  A   Yeah, I'm not sure if the police were called or not.
9      That's something I would have to --
10 Q   Okay.
11 A   -- investigate.
12 Q   So is it true then until you check, today you have
13     no knowledge of a call to the police about that
14     incident?
15 A   Mm-hmm.  Correct, yeah.
16 Q   Okay.  Next, you said they walked the perimeter of
17     the building.  Right?
18 A   Mm-hmm.
19 Q   Is that a yes?
20 A   Yes, mm-hmm.  Yep.
21 Q   Is that uncommon for people out on that sidewalk to
22     walk the perimeter of the building?
23 A   Uh, since we've purchased that building, yes, we
24     haven't had many people walk around that building
25     the way he was.

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

**148**

1  Q   How was he doing it?
2  A   He was walking around it looking, um, like he was
3      looking at things; looking for something, um, yeah.
4      It wasn't, um, in a honest, um, good-hearted just
5      looking at around our building.  It looked like he
6      was looking for maybe vulnerabilities.
7  Q   Okay.  And you're making those statements based on
8      what?  His facial expressions?
9  A   Uh, just looking at the way he was walking around
10     the building and what he was looking at, so just
11     based on that.
12 Q   Okay.  When you say, "the way he was walking around
13     the building," what do you mean?  Something about
14     his physical gait or what?
15 A   Well, as I just said, it looked like he was
16     looking -- he was looking intently at our property.
17     It looked like he was looking at the items that we
18     had on our property, just like he was really wanting
19     to check out what was on our property for his
20     knowledge and potential use in the future.
21 Q   And that made you nervous?
22 A   Yes.
23 Q   That caused you fear?
24 A   It made me nervous, mm-hmm.
25 Q   It caused you fear?

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

149

```
 1   A   Yes.
 2   Q   Okay.  So if I went down there today and walked
 3       around and looked at it really carefully, would you
 4       accuse me of stalking?
 5   A   Uh, potentially.
 6   Q   Potentially, depending on what?
 7   A   Depending on what you were doing.
 8   Q   What would I have to be doing for you to accuse me
 9       of stalking, if I walk around and look intently at
10       your building?
11   A   All I can tell you is that he was there at our
12       property, looking onto our property, walking around
13       our property, looking inward at our property; not
14       just there simply, as some protesters do, they come
15       and they try to hand out literature to people coming
16       onto the property.  He didn't care about that.  He
17       wanted to look at what was going on, on our
18       property.
19   Q   And that's based on your assuming what was in his
20       mind that day?
21   A   Not assuming.  It's what I saw on camera, watching
22       him walk around our property.
23   Q   So you can look at a camera and tell what somebody
24       has in their mind?
25   A   I never said that I knew what was in his mind.  I
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

150

```
 1       said that it's what I saw on our surveillance
 2       camera, watching his actions around our property.  I
 3       don't know what he was thinking exactly, but his
 4       actions didn't speak very well.
 5   Q   So you can look at the camera and see Mr. Holick's
 6       actions and determine that he had some dangerous
 7       purpose?
 8   A   It was disconcerting.
 9   Q   What was it about it that scared you?
10   A   I don't know why anybody would have to go to one's
11       place of business or their home and, uh, look so
12       intently at what they have there on that property.
13   Q   Now, isn't it true that I could go down to your
14       place of business just about any time there's
15       protesters out there and see somebody walking the
16       perimeter of the building?
17   A   Actually on most days, uh, the protesters just stand
18       at their table at the gate and hand out literature;
19       and then we have, I think the Quiverfull group that
20       comes on Fridays and they wave signs.
21           THE REPORTER:  The what group, ma'am?
22           THE WITNESS:  I think the Quiverfull.  I
23       think it's a Quiverfull group.  It's a Christian
24       sect.
25   BY MR. McKINNEY:
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

1    Q    Do they wave the same kind of signs with the
2    grotesque images?
3    A    No.
4    Q    What kind of signs do they wave?
5    A    Oh, they have something something babies.com; Save a
6    Baby; something like that.
7    Q    How often are there protesters at that clinic?
8    A    Uh, about four days a week.
9    Q    And that would be true in January of 2013?
10   A    Uh, no.
11   Q    Okay. In January of 2013, how often did you have
12   protesters at the clinic?
13   A    Um, I would have to look. I can't say.
14   Q    Is it true that the protests at the clinic now are
15   much calmer than they were in the days of
16   Dr. Tiller?
17            MR. EYE:  Objection; vague.  You may
18   answer.
19            THE WITNESS:  Um, there aren't as many
20   protesters, but there's still protesters.
21            (Burkhart Deposition Exhibit No. 8
22   marked for identification.)
23   BY MR. McKINNEY:
24   Q    I'll hand you what's been marked as Exhibit 8.  You
25   recognize that?

151

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

---

1    A    It looks like you printed this off of our web site,
2    one of our web sites.
3    Q    So that's a yes, you recognize it?
4    A    Uh, yes.
5    Q    Okay.  Um, if you would go to the third page, you
6    see where it says, Protests Continue?  See that?
7    A    Mm-hmm.  Yes.
8    Q    Is it true that at that clinic, abortion opponents
9    are a regular presence at the clinic's gates?
10   A    Yes.  I just stated that they're there about four
11   days a week.
12   Q    Okay.  And didn't you say in this document that the
13   protests are much calmer now than in Tiller's days?
14   A    There aren't as many protesters, but there are still
15   protesters.
16            MR. McKINNEY:  Okay.  Nonresponsive.
17   Object.  Move to strike.
18   Q    Didn't you say in this document, Exhibit 8, that the
19   protests are much calmer than in Tiller's days?
20   A    Where do you see that?  I'm sorry.  I don't see it
21   here.
22   Q    (Indicating.)
23   A    Mm-hmm.  That's what it says there.
24   Q    I didn't ask what it says there.  Didn't you say
25   that?

152

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

1   A   Uh, yes, I assume I did, yes.
2   Q   Well, this is a publication by your organization,
3       isn't it?
4   A   Hmm, it's from -- by Deb Gruber with the *Wichita*
5       *Eagle.*
6   Q   It's on your web site; right?
7   A   Yeah.
8   Q   Okay.  You don't put things on your web site that
9       quote you if they're wrong, do you?
10  A   I didn't say it was wrong.
11  Q   So it's true, isn't it?
12  A   I said yes; that's right.
13  Q   And sometimes protesters hold graphic photographs;
14      right?
15  A   Okay.  Yes.
16  Q   Now, when those protesters are at your workplace
17      holding graphic photographs, have you filed
18      anti-stalking complaints against them?
19  A   No.
20  Q   Now, you told us that on November 17th, 2012, you
21      were not even there in your house while they were
22      outside protesting; right?
23  A   That's correct, because the police had notified me
24      that they were going to be there.
25  Q   So you don't have any knowledge that Pastor Holick

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

153

1       even knew you were home that day or thought you were
2       there?
3   A   I don't know.  He was in -- outside my house,
4       though.
5           MR. McKINNEY:  I'll object again to the
6       volunteer argument and nonresponsive answer and move
7       to strike.
8   Q   Before you took your current job, you knew there had
9       been thousands of people arrested at that clinic;
10      right?
11  A   Um, yes.
12  Q   And you don't really know why Mark Holick was at the
13      clinic in January of 2013 in this additional
14      incident you mentioned in your petition, do you?
15  A   Not exactly.
16  Q   He could have been there to preach, couldn't he?
17  A   He wasn't preaching.
18  Q   Well, did you see everything he did that day?
19  A   We have surveillance of the entire property.
20  Q   Again, that's nonresponsive.  Did you see everything
21      Mark Holick did that day in January of 2013?
22  A   No, but I could go back and review the surveillance
23      video.
24  Q   Do you know if he had any religious purpose for
25      being there?

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

154

1  A   It didn't appear that he did.

2  Q   I'm not asking what it looked like.  Here's my

3      question:  Do you know whether Pastor Holick had a

4      religious purpose for being at the clinic on

5      January, 2013?

6  A   I don't know.

7          MR. McKINNEY:  Let's take a break.  We've

8      been going quite awhile.

9              (A break was then taken from

10             3:30 p.m. to 3:40 p.m.)

11  BY MR. McKINNEY:

12  Q   Let's go back to Exhibit 8 for a moment.  Do you

13      have that in front of you?

14  A   Um, yeah.

15  Q   Um, there on that same page, it says, "Burkhart said

16      one protester stationed at the clinic's gate for a

17      while dressed in medical scrubs and carried a

18      clipboard," and then you said, "She was pretty

19      successful at getting people to stop."  See where

20      I'm at?

21  A   Mm-hmm.  Yes.

22  Q   Is that true?

23  A   Uh, yes, 'cause she was presenting herself as being

24      part of the clinic staff.

25  Q   And that she got people to stop on their way into

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

155

---

1      the clinic?

2  A   Mm-hmm.

3  Q   Is that a yes?

4  A   Yes, mm-hmm.

5  Q   Did you, uh, call the police about that?

6  A   Um, I did call the police once because she did walk

7      onto our property, and so we did definitely report

8      her to the police.

9  Q   You didn't report her to the police for stopping

10     traffic before they got into the clinic?

11  A   Um, I had talked with the police about the fact that

12      she was obstructing people from coming into, uh,

13      from pulling into the parking lot.

14  Q   Did you press any charges?

15  A   Hmm, no.

16  Q   As far as you know, Mark Holick's never set foot on

17      that property, has he?

18  A   I think that's why he was arrested in 2001, I think

19      because he did come onto the property, now that you

20      mention it.

21  Q   Do you have a clear memory of that?

22  A   That seems to be the case.

23  Q   Weren't those three arrested there at the north end

24      of Bleckley where it intersects with Kellogg,

25      because they were keeping traffic from coming down

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

156

157

1    Bleckley Street?

2    A    Well, maybe they were impeding traffic. I know that

3         at some point, some people had come onto the

4         property.

5    Q    Well, I just want to ask about what you specifically

6         know about Mark Holick.

7    A    Mm-hmm. Well, I just know he was arrested at least

8         once at the clinic and, um, I was thinking it might

9         have been for that incident coming onto the

10        property, but maybe it was impeding traffic.

11   Q    Okay.

12   A    So I'm, I'm not --

13   Q    Is there any incident which you can testify under

14        oath to today in which Mark Holick set foot on

15        clinic property?

16   A    Hmm.  No, I'd have to look.   Hmm-mm.

17   Q    Look at what?

18   A    I'd have to see if that was him who walked onto the

19        property. I don't -- I'm not sure. I can't -- so I

20        can't say for sure today.

21   Q    Walked onto the property when?

22   A    It would have been early 2000's, 2001.

23   Q    And again, you're talking about those three people

24        that got arrested, or something else?

25   A    Yeah, there was another incident where some people

158

1         walked onto the property.

2    Q    Okay.  And you don't know that Mr. Holick was in

3         that, do you?

4    A    I'm not sure.  I was thinking maybe he was, but I'm

5         not sure.

6    Q    Looking at Exhibit 8, it has your photo; right?

7    A    Yes, uh-huh.

8    Q    And, uh, as I look through these articles online,

9         your photo is in a lot of these articles.  Isn't

10        that true?

11   A    Um, I don't know.  I guess so.

12   Q    Have you --

13   A    I don't keep track of that.

14   Q    Have you ever objected to any, uh, publication about

15        putting your likeness in a publication that would go

16        online to millions of people?

17   A    Um, I've let it be known that I don't like to have

18        my photo taken.

19   Q    Okay.  Well, Exhibit 8, your photograph's published

20        on your own web site, isn't it?

21   A    Mm-hmm.

22   Q    Is that a yes?

23   A    Correct.  Mm-hmm.

24   Q    Did you ever protest that?

25   A    No.

1    that's what you're asking.
2  Q  Well, I was asking specifically about radio, and
3     you're including that in your answer; correct?
4  A  Yes.
5  Q  And you also give numerous interviews to newspapers
6     all across the United States. Right?
7  A  Sometimes.
8  Q  And you've even given interviews worldwide?
9  A  Yes, mm-hmm.
10 Q  And you have not allowed Mark Holick to intimidate
11    you from giving any of these interviews; right?
12 A  No, because I'm not going to be bullied around.
13 Q  So that's a yes, you've not allowed that to
14    intimidate you?
15 A  Yes. He's frightened me, but I've not allowed him
16    to intimidate me; into submission, I guess I should
17    say.
18 Q  How many years did you work with Dr. Tiller? I see
19    seven years and I see eight years. What's your
20    testimony today?
21 A  Well, I knew him for eight years and I worked with
22    him for seven.
23 Q  You make your living from your work in the
24    pro-choice arena. True?
25 A  Mm-hmm. That's true.

161

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

---

1  Q  And the clinic is currently paying off debt. True?
2     MR. EYE: Objection. That's -- that, I
3     don't even think can lead to anything that's
4     discoverable.
5     MR. MCKINNEY: Sure it can. It goes to
6     her motive and bias. She gets publicly from this.
7     She makes money. She gets contributions. Of course
8     she's going to raise a stink.
9     MR. EYE: But whether there's debt
10    service --
11    MR. MCKINNEY: It's financial motive.
12    MR. EYE: Answer the question.
13    THE WITNESS: The clinic is paying off
14    debt, yes.
15 BY MR. MCKINNEY:
16 Q  Okay. And since you filed your petition for
17    protection from stalking against Pastor Holick, have
18    you been on news or informational programs to talk
19    about that?
20    MR. EYE: About paying off debt?
21    MR. MCKINNEY: No; about her petition
22    against Mark Holick.
23    MR. EYE: Okay.
24    THE WITNESS: Um, I have not been on news
25    programs to specifically talk about that, no.

162

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

167

```
 1   Decade ago or so.
 2   Q   And then you were involved in the clinic defense in
 3       2011?
 4   A   Mm-hmm, yes, which I talked about in the morning.
 5   Q   And what about marches?  Have you marched on behalf
 6       of what you would call reproductive rights?
 7           MR. EYE:  Other than what she's already
 8       described?
 9           MR. McKINNEY:  Yeah, that one march.
10           THE WITNESS:  Um, I don't recall anything
11       else.
12   BY MR. McKINNEY:
13   Q   Is it true you've been politically active on behalf
14       of the, uh, pro-abortion cause?
15   A   Um, yes.
16   Q   Tell me about that.
17   A   Um, I was the director of a political action
18       committee for several years that, um, worked to get,
19       uh, pro-choice candidates elected, and then I also
20       worked on legislative matters, so --
21   Q   Have you lobbied on behalf of abortion?
22   A   I have lobbied on behalf of women's reproductive
23       rights, yes, which includes abortion, yes.
24   Q   How many years?
25   A   Uh, well, at least seven, eight.  Eight, yeah.
```

168

```
 1   Q   And it's your understanding that you have, in the
 2       United States, a constitutional right to express
 3       your support for what you call reproductive rights?
 4   A   Yes, mm-hmm.
 5   Q   And it's your understanding you have a
 6       constitutional right to engage in activities like
 7       marches, clinic defense, counterprotests, things of
 8       that nature, on behalf of reproductive rights?
 9   A   Yes, but I've never engaged in a counterprotest.
10   Q   Do these protesters that you complain about in your
11       petition in Exhibit 1 have a constitutional right to
12       engage in expressing their beliefs about abortion?
13           MR. EYE:  Object.  That does call for a
14       legal conclusion, based upon understanding of First
15       Amendment jurisprudence and so forth, but --
16   BY MR. McKINNEY:
17   Q   All right.  I'll clarify it.  I'm not asking you as
18       a lawyer to give a legal opinion.  I'm asking you as
19       to your state of mind.  Is that your understanding?
20           MR. EYE:  I'm going to object again,
21       because I don't --
22           MR. McKINNEY:  Okay.  Okay.
23           MR. EYE:  But you can answer the best you
24       can.
25           THE WITNESS:  They have a right to voice
```

169

```
 1      their opinion, as long as they're not crossing the
 2      line into violence and intimidation and harassment.
 3   BY MR. McKINNEY:
 4      Q    Do the same protesters which you talked about today
 5           in relation to your petition have a constitutional
 6           right, in your mind, to exercise their religious
 7           beliefs?
 8           MR. EYE:    Same objections I made before.
 9      I think there is a question pending.
10           THE WITNESS:    Well, yes, we all have a
11      right to our religious beliefs.
12   BY MR. McKINNEY:
13      Q    I'm not asking about religious beliefs.  I'm asking
14           about a right to express their religious beliefs in
15           public protest.
16           Do these protesters you've complained about
17      when discussing your petition have a constitutional
18      right, as you understand it, to express their
19      religious beliefs about abortion?
20           MR. EYE:    Same objection.
21           THE WITNESS:    They do, as long as they're
22      not harassing and intimidating and inciting
23      violence.
24   BY MR. McKINNEY:
25      Q    Um, now, back there on that third incident
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

170

```
 1      where Mark Holick is at the clinic walking around
 2      it, uh, you don't know that he did that to
 3      specifically direct his conduct at you, do you?
 4      A    No, I can't say that it was specific to me.  It
 5           seemed to be specific to the business at that time.
 6      Q    Okay.  You also say there, in that third paragraph
 7           on Page 2 of Exhibit 1, that he was scoping it out.
 8      What did you mean by that?
 9           MR. EYE:    Counsel, I think she answered
10      those questions before.  I mean, I should say I
11      think you asked a whole lot of questions that I
12      believe she responded to.
13           MR. McKINNEY:    I haven't asked that
14      specific question.
15           MR. EYE:    Well, I'm going to object as
16      asked and answered, but go ahead.
17           MR. McKINNEY:    She told me what she
18      thought was intimidating or something about the
19      manner in which he walked, but I'm asking about her
20      use of this term, "scoping it out," and what she
21      means.
22           MR. EYE:    Okay.
23           THE WITNESS:    Well, I felt like I did
24      answer it earlier.  Um, what he was doing when I
25      perceived him to be scoping out our business was
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

171

```
 1   standing and looking onto our property, walking
 2   around the perimeter of our property, looking inward
 3   to the property to see what might be going on, what
 4   we might have on the property.
 5        Um, it gave me pause because he was not just a
 6   protester handing stuff out to maybe -- we weren't
 7   even open at the time, too.  We were still under
 8   construction at that time, um, so his, uh, actions
 9   gave me pause.
10   BY MR. McKINNEY:
11   Q    Okay.  Did those actions of Pastor Holick in walking
12        around the clinic torment you?
13   A    Well, it crossed my mind that maybe they were
14        looking for a place where a bomb might go or maybe a
15        sniper might be.  Um, those things did cross my
16        mind.
17   Q    So is that a yes, Mr. Holick walking around the
18        clinic in January of 2013 tormented you?
19   A    Yes.
20   Q    Okay.
21   A    I thought about those things more than once.
22   Q    And did the act that you complain of here and
23        additional incidents on Page 2 of Exhibit 1 of
24        Mr. Holick walking around at your clinic, um,
25        terrorize you?
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

172

```
 1   A    Well, I would say yes, I was -- thought about bombs,
 2        guns being fired, yes.
 3   Q    Okay.  Are you terrorized when anybody walks around
 4        your clinic in what you regard as a, uh, scoping it
 5        out manner?
 6   A    Uh, yes.  It puts me on high alert.
 7   Q    So when Mark Holick was there in January of 2013,
 8        uh, engaging in these activities you mentioned under
 9        additional incidents, that seriously alarmed you,
10        didn't it?
11   A    It alarmed me that yes, that he would be engaging in
12        these activities.
13   Q    Okay.  And could those activities at that time have
14        had a legitimate or religious purpose to Mark
15        Holick?
16             MR. EYE:  Objection.  Calls for the
17        witness to speculate.
18             MR. McKINNEY:  She's been doing it all
19        day.
20             MR. EYE:  I make my objection so, you
21        know --
22             THE WITNESS:  Um, maybe.
23   BY MR. McKINNEY:
24   Q    What do you mean by maybe?
25   A    Maybe he would have had a legitimate purpose there.
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

173

```
 1       I don't know why anybody would have a legitimate
 2    purpose outside a business where they're not
 3    employed, but maybe.
 4    Q  Well, you've got protesters down there today, don't
 5       you?
 6    A  Right, which don't have a legitimate purpose there.
 7    Q  You don't think they have a legitimate religious
 8       purpose in their minds for being there?
 9    A  It has nothing to do with religion.
10    Q  How can you conclude that?
11    A  It has to do with tyranny and what people think
12       other people should be doing or not doing.  It has
13       nothing to do with religion.
14    Q  That's how you look at it.  True?
15    A  That's correct.
16    Q  Um, now, when you say that this conduct by Mark
17       Holick referenced in the third incident terrorized
18       you, have you ever been diagnosed with any type of
19       depressive or anxiety disorder?
20    A  No.
21    Q  Have you ever had treatment for, uh, depression or
22       anxiety?
23    A  Um, I had treatment for depression once back in the
24       early '90s.  I, um, had been in Africa in the Peace
25       Corps and I took Mefloquine, which was an
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

174

```
 1    antimalarial, and that antimalarial since has been
 2    taken off the market.  It was proven to, um, be
 3    disturbing to some people.  I happened to be one of
 4    those people and I was treated with antidepressants
 5    for six months.
 6    Q  Any other occasions?
 7    A  No, hmm-mm.
 8    Q  Where did this occur at?
 9    A  I was in Togo in West Africa.
10    Q  No, I mean where were you treated at?
11    A  Um, uh, here in Wichita.
12    Q  By whom?
13    A  Uh, Dr. Ernst.
14    Q  What's his first name?
15    A  It's T-a-r-i, a woman.
16    Q  Okay.
17    A  And Ernst.
18    Q  Do you know Dr. Mila Means?
19    A  Um, I've made her acquaintance.  I would not say
20       that I know her.
21    Q  Have you ever discussed pro-life protesters with
22       Dr. Means?
23    A  Um, hmm, not really, no.
24    Q  Is this treatment by Dr. Ernst the only time you've
25       been treated for fear or anxiety or disorders?
```

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

## Page 185

```
 1    A    Uh, yes, mm-hmm.  Mm-hmm.
 2    Q    Okay.  Also, in Paragraph 5 on Page 2 of Exhibit 1,
 3         you said, "He also uses violent language."  Tell me
 4         what violent language Mark Holick has used against
 5         you or directed at you.
 6    A    Well, um, you know, once again, I had explained
 7         this, uh, with the flyer that he, um, handed out.
 8              MR. EYE:  Exhibit 6.
 9              THE WITNESS:  Exhibit 6 and, uh, then the
10         signage that was at, uh, my house and that it has
11         inflammatory and, uh, language, language meant to
12         incite violence.
13    BY MR. McKINNEY:
14    Q    Okay.  So when you say in Paragraph 5 on Page 2 of
15         Exhibit 1 that he uses violent language, you mean to
16         say that Pastor Holick wrote the flyer or
17         distributed the flyer?
18    A    Um, I don't know for sure, but I know that he was
19         leading that group, and he was leading that group
20         under the name of Spirit One Christian Ministries,
21         of which he's the head, so, um, he had to have, uh,
22         either wrote it, okayed it, um, gave some sort of
23         acknowledgement.
24    Q    Okay.  So when you say there in Paragraph 5 that he
25         uses violent language --
```

## Page 186

```
 1    A    Mm-hmm.
 2    Q    -- you're saying through his group and their use of
 3         signs and flyers; correct?
 4    A    Hmm, no, I meant -- I meant Mark Holick.
 5    Q    Okay.  Have you ever heard any violent language come
 6         out of Pastor Holick's mouth?
 7    A    Um, no; just what I've read on this flyer and seen
 8         on the little placards.
 9    Q    On the placards, you mean the signs that people in
10         the group hold?
11    A    The signs that were outside my house.
12    Q    Now, when you say, uh, you take this very seriously,
13         what did you mean by that?
14    A    I take death threats very seriously.
15    Q    And that would be the sign that says, "Where is your
16         church?"
17    A    "Where's your church" and the language written in
18         this flyer.
19    Q    Okay.
20    A    And also on the posters that they put.
21    Q    So to summarize, when you say in Paragraph 5, "He
22         also uses violent language," you mean death threats
23         that you perceive to be in the flyer and on signs
24         that people were holding outside your house.  Is
25         that a fair summary?
```

187

```
 1    A     Mm-hmm.  Correct.
 2    Q     Okay.  Next, Paragraph 7 on Page 2 of Exhibit 1,
 3          let's see.  First of all, has Mark Holick ever
 4          followed you?
 5    A     Uh, not to my knowledge.
 6    Q     Has he ever telephoned you?
 7    A     Mmm, not to my knowledge.
 8    Q     Has he ever contacted you personally?
 9    A     Uh, I believe yes, by being outside of my house.
10    Q     Okay.  So other than your belief that he was outside
11          your house, you know of no other contact Mark Holick
12          has had with you personally.  True?
13    A     I'm not aware of any.
14    Q     Okay.  Has Mark Holick ever physically abused you?
15    A     No.
16    Q     Has he ever molested you?
17    A     No.
18    Q     Has he ever interfered with your privacy?
19    A     Yes.
20    Q     And that would be the activity outside of your house
21          on the two dates mentioned in your petition?
22    A     Yes.
23    Q     And the next one, isn't it true that Mark Holick has
24          never entered your premises or residence?
25          MR. EYE:  Asked and answered.  You may
```

188

```
 1          answer.
 2    BY MR. McKINNEY:
 3    Q     I'm asking specifically here about Paragraph 7 on
 4          Page 2 of Exhibit 1 where you've checked the third
 5          box.  Is it true that Pastor Holick has never
 6          entered the premises of your home?
 7    A     I don't believe so.
 8    Q     You don't believe that he has?
 9    A     No, I don't believe so.
10    Q     Is that a yes, he has not done that?
11    A     Well, it would be no, he has not entered my home, to
12          my knowledge.
13    Q     Okay.  And he's not entered your work premises, to
14          your knowledge, has he?
15    A     Uh, not since we bought the property; not to my
16          knowledge.
17    Q     Okay.  In 2001, you said you were involved in that
18          protest activity in some manner.  You remember that?
19    A     Well, I'll say once again, it was not a protest.  It
20          was clinic defense.
21    Q     Well, no, I was talking about the --
22    A     Because the anti-choicers were showing up at the
23          clinic.
24    Q     Yeah, I was talking about the general event --
25    A     Okay.
```

1  Q   What's your social Security number?
2      MR. EYE: Is that really necessary?
3      MR. McKINNEY: Yeah, for discovery.
4      MR. EYE: For privacy, can we agree to
5  seal this so that her SS number is not floating
6  around?
7      MR. McKINNEY: We can have the court
8  reporter redact it. I just -- and I will agree to
9  use it only for discovery purposes, if I even need
10 it.
11     MR. EYE: Will you agree to not disclose
12 it to anybody except --
13     THE WITNESS: I will not give my Social
14 Security number.
15     MR. EYE: There you go.
16     MR. McKINNEY: Okay. We'll have the same
17 agreement for Mr. Holick -- Pastor Holick then.
18     MR. EYE: Well, I would have not bothered
19 to ask him for his SS number anyway.
20     MR. McKINNEY: I always do, every
21 deposition I take.
22     THE WITNESS: Hmm-mm.
23     MR. EYE: Well, privacy concerns abound,
24 so --
25     THE WITNESS: Hmm-mm. Thank you.

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

197

---

1      MR. McKINNEY: Now, it's true -- and I'm
2  going to reserve my right to take that up with the
3  court. I think that's legitimate discovery, but I
4  want to keep moving at this point.
5  Q   Um, it's true that when you filed your petition on
6  Exhibit 1, you placed your home address in the
7  public record; correct?
8  A   Correct.
9  Q   Because you included it when you attached Exhibit 6
10 to your petition. True?
11 A   Correct. Mm-hmm.
12 Q   Do you know of any acts of violence committed by
13 anyone under the direction of Mark Holick?
14     MR. EYE: Asked and answered. Go ahead
15 and answer if you can.
16     THE WITNESS: Not that I'm aware of.
17     (Burkhart Deposition Exhibit No. 13
18     marked for identification.)
19 BY MR. McKINNEY:
20 Q   Ma'am, I'll show you what's been marked as Exhibit
21 13. Tell me if you can identify that. Is that a
22 document published on your web site?
23 A   Uh, yes.
24 Q   Okay. And if you'll look at Page 2, there's a quite
25 a bit of information about your background. Take

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
EXHIBIT 7

198

1    A        -- So --
2    Q        -- prior to filing your petition, Exhibit 1 --
3    A        Mm-hmm.
4    Q        -- you never went out and looked on the Internet to
5             see what you could find about Holick, except for his
6             address and phone number?
7    A        Right, and I went back -- I did go back online,
8             because he had some signage up on his Spirit One
9             church that was, um, I think comparing Dr. Tiller to
10            a murderer in some anti-Islamic thing, I don't know,
11            that I had seen.
12   Q        You had seen it personally?
13   A        Mm-hmm, yeah.
14   Q        Okay.
15   A        Definitely the one about Dr. Tiller, I had.
16   Q        And when you saw that sign, about what year was it?
17   A        Oh, I can't tell you.  Um, mid-2000's maybe.  I
18            don't know.
19   Q        When you saw that sign on the marquee at Pastor
20            Holick's church, did that sign cause you some
21            terror?
22   A        It caused me to be concerned about Dr. Tiller.
23   Q        Did it cause you serious alarm?
24   A        It caused me to be alarmed for Dr. Tiller, yes,
25            mm-hmm.

223

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

---

1    Q        But not for yourself?
2    A        Not at that time, because that was targeted at
3             Dr. Tiller.
4    Q        Prior to November of 2012, knowing all you knew then
5             about what happened to Dr. Tiller --
6    A        Mm-hmm.
7    Q        -- did you already have some serious concerns about
8             your job and your safety in that capacity?
9    A        I had concerns about my safety, mm-hmm, yes.
10   Q        You were already afraid of violence by some
11            protester before November of 2012.  True?
12   A        That there could potentially be violence, mm-hmm,
13            yes.
14   Q        Do you know whether these protests or incidents you
15            allege in your petition would have taken place
16            without the involvement of Mark Holick?
17   A        I don't believe they would have.
18   Q        I didn't ask what you believe.  I'm asking what you
19            know.  Do you know for a fact that you can testify
20            under oath that these incidents would not have
21            occurred but for the conduct of Mark Holick?
22   A        Um, I don't know.
23   Q        Okay.
24   A        But I haven't had any protests since.
25   Q        Um, and that could be because you, uh, got an order

224

FILED UNDER SEAL
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

1  Correct so far?

2  A  No, that was if somebody were to be followed, uh, at

3     the time that was instituted.

4  Q  I thought you said someone was actually followed.

5  A  Yeah, subsequently, someone was followed at our

6     clinic, mm-hmm.

7  Q  Who was followed?

8  A  A staff member.

9  Q  Who was that?

10 A  Lynlee Weber.

11 Q  How do you spell that?

12 A  Uh, L-y-n-l-e-e, and then Weber, W-e-b-e-r.

13 Q  What was her position?

14 A  Um, she is, um, a uh, practicum student and she does

15    our counseling.

16 Q  Who followed her?

17 A  It was a woman.  I'd have to look back.

18 Q  When was it?

19 A  I, I don't remember exactly.

20 Q  Where was it?

21 A  Uh, she was followed from the clinic to the store

22    and then back; something like that.

23 Q  So you don't have any evidence that that was caused

24    by Mark Holick, do you?

25 A  No, nor was I asserting it was.

1  Q  Okay.  So the change in procedures at the clinic,

2     meaning a review of some security procedures, was

3     caused by the group protest at your home and a

4     concern about people being followed and what else?

5  A  Just any other, uh, issues that might arise at the

6     clinic that might put staff members in harm's way.

7  Q  Did you say also because of people at the clinic

8     doing something?

9  A  Uh, you know, I don't recall exact language.  I,

10    I -- I'd have to look, but it was about work safety,

11    safety at home.

12 Q  And that occurred -- that all occurred when?  April,

13    2013?  March?

14 A  Um, it was some -- it -- it was March, April.  I --

15    I don't remember exactly.  It was about a year ago.

16 Q  Somewhere in the spring of 2013?

17 A  Uh, yes.

18 Q  Okay.  Now, this incident mentioned in your petition

19    of January of 2013 --

20 A  Mm-hmm.

21 Q  -- where Mark Holick was at your place of business

22    with John Pride, did that incident itself cause you

23    to change any policies and procedures at the clinic?

24 A  Um, well, we had security briefings and, uh, paid

25    pretty close attention to security.

231

1   Q   Because somebody saw Mark Holick walking around
2       outside?
3   A   Uh, because of the potential for violence at the
4       clinic.
5   Q   Potential of violence by whom?
6   A   Uh, no one in particular at this time.
7   Q   When did you have those security briefings?
8   A   Oh, I can't -- I don't remember exact dates.
9   Q   Well, was it after March 7 of 2013?
10  A   Um, I'm pretty sure we had some before that and then
11      after -- after that.
12  Q   Okay.  The ones before, were they before November of
13      2012?
14  A   Um, maybe, but I don't -- I don't know.
15  Q   Now, assume that Pastor Holick was not at the
16      protest mentioned in your petition.  Would you have
17      had the fear and intimidation you allege in your
18      petition anyway?
19  A   Well, knowing that he's the leader of that, uh,
20      ministry and, uh, that I know that he also had,
21      um -- you know, he was a person who had met with law
22      enforcement, uh, yes.
23  Q   Okay.  Uh, and you just said he was a person who met
24      with law enforcement?
25  A   Mm-hmm.  I was told by the police he had, uh, met

232

1       with them.
2   Q   Did they tell you that John Pride met with them?
3   A   Um, well, I think they might have, yes, mentioned
4       his name, yes.
5   Q   Did they tell you they met with the whole group?
6   A   Uh, no, hmm-hmm.
7   Q   Okay.  Which policeman are you --
8   A   Uh, I think it was Officer Hinner.
9   Q   So Officer Hinner told you that before November,
10      2012, he had met with Mark Holick about that
11      activity?
12  A   Mm-hmm, yep; that they were planning on coming to my
13      house.
14  Q   Where did he meet with Pastor Holick --
15  A   I don't --
16  Q   -- in that meeting?
17  A   I have no idea.
18  Q   But he specifically told you that Mark Holick told
19      him the group was coming to your house?
20  A   Mm-hmm.
21  Q   Is that a yes?
22  A   Yes, mm-hmm.
23  Q   Okay.
24  A   Mm-hmm.
25  Q   Did Deputy Hinner mention anybody else?

1  A   Well, I think he did mention, uh, Pride.
2  Q   Did Officer Hinner --
3  A   Mm-hmm.
4  Q   -- I'll correct myself.  Did Officer Hinner say
5      they were coming to your neighborhood or they were
6      coming to your house?
7  A   Uh, they were coming, uh, to protest my living space
8      and in my neighborhood.  I don't remember his exact
9      wordage.
10 Q   Do you have any idea why, if this activity in your
11     neighborhood was so terrifying, the police didn't do
12     anything about it?
13 A   No, I don't know.
14 Q   Now, uh, do you see your statements sometimes quoted
15     in what I would call the pro-life media, the web
16     sites and publications on the other side of the
17     issue?
18 A   Um, I have occasionally.  I --
19 Q   Have you ever seen yourself misquoted in that media?
20 A   I can't say.  I really don't look at that media.
21 Q   Okay.  And that's because, uh, you wouldn't regard
22     it as reliable, would you?
23 A   Um, it's not that.
24 Q   Okay.  Do you regard the things that the pro-life
25     media says about you as reliable?

1  A   Um --
2          MR. EYE:  The ones of which she's aware?
3          I mean --
4          MR. McKINNEY:  Right.  Correct.
5          MR. EYE:  Of the ones that you
6      know about.
7          THE WITNESS:  I guess.  I don't know.
8  BY MR. McKINNEY:
9  Q   Okay.  Now, earlier you told me Dr. Tiller had been
10     harassed and threatened; right?
11 A   Yes, mm-hmm.
12 Q   And isn't it true that you have no personal
13     knowledge which would link Pastor Holick to any kind
14     of violence against Dr. Tiller?
15 A   No.
16 Q   Is that true?
17 A   That's correct.
18 Q   You know of no harassments or threats by Pastor
19     Holick specifically against Dr. Tiller.  True?
20 A   Right.  I don't know of any.
21         MR. McKINNEY:  Okay.  Are we supposed to
22     get out of here or something?
23         MS. THOMPSON:  Oh, they're leaving.  That
24     was the message.