IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


MARK HOLICK,

          Plaintiff,

v.                                                Case No. 16-1188-JWB

JULIE A. BURKHART,

          Defendant.


**MEMORANDUM AND ORDER**

This matter comes before the court on Defendant's motion for summary judgment. (Doc. 249.) The motion is fully briefed and ripe for decision. (Docs. 249-1, 259, 260, 261, 262, 269.) For the reasons stated herein, the motion (Doc. 249) is GRANTED IN PART and DENIED IN PART.

### I. Background

Defendant operates an abortion facility in Wichita. In 2012 and 2013, Plaintiff participated in several anti-abortion protests, including two near Defendant's residence. On March 17, 2013, Defendant filed a petition for a protection-from-stalking ("PFS") order against Plaintiff in Sedgwick County District Court, pursuant to which a state judge issued an ex parte temporary PFS order the same day. Over two years later, Plaintiff moved for summary judgment in the stalking case, and Defendant voluntarily dismissed the action. Plaintiff subsequently filed this diversity action asserting tort claims under Kansas law for malicious prosecution and abuse of process.

## II.  Uncontroverted facts

The applicable rules require a summary judgment respondent to begin with "a concise statement of material facts" as to which that party contends a genuine issue exists.  D. Kan. R. 56.1(b)(1).  Plaintiff's statement is not concise and includes large blocks of deposition testimony without identification of any material fact.[1]  Plaintiff has also responded to Defendant's statement by asserting a multitude of facts that are not supported by citations to the record, contrary to D. Kan. R. 56.1(b)(2).  (Doc. 262 at 20-25.)  These failures have hampered the court's efforts to compile a statement of material facts.  Based on the materials cited, the court finds the following facts to be uncontroverted for purposes of summary judgment.

In 2012, Defendant announced plans by her organization Trust Women to open South Wind Women's Center in Wichita, a clinic where abortions would be performed.  Dr. George Tiller had operated a similar clinic at that location until 2009, when he was murdered by an anti-abortion

---

[1] For example, Plaintiff asserts as a statement of fact:
"69.  Burkhart testified:
Q. Let me stop you on that one.  Where is the death threat in that?
A. Well, Mr. Holick here was talking about making up – the Christians and the church of Jesus Christ making up my mind for me, and I take that as a threat.  If you are making up somebody's mind for them –
Q. Okay.
A. – that's a statement of force.
Q. Okay. So when you read the words, "When the church of Jesus Christ makes up her mind"—
A. Mm-hmm.
Q. – you don't see that as a reference to the church as a "her"?
A. No, that's referencing me.
Q. Have you ever heard of the bride of Christ?
A. No.
Q. Have you ever heard Christians refer to the church as "her"?
A. No.
Q. And so again, you're applying your own understanding of those terms there; right?
A. Well, the subject of this flyer is not the church.  It was me, so I didn't think the church was the subject.
Q. Of the sentence, it says, "Church of Jesus Christ makes up her mind"?
A. Mm-hmm. No.
Q. Okay.
A. The subject wasn't the church.  The subject was me.
Q. Are you mentioned in that sentence?
A. No, but I'm the subject of this flyer."
(Doc. 262 at 10-11.)

activist.  Dr. Tiller was fatally shot while serving as an usher at his church in Wichita.  Defendant worked with Dr. Tiller from 2002 until 2009.

Plaintiff, who has been doing pro-life ministry since 1978, founded a church named Spirit One Christian Center (the "Church") in 1991.  Plaintiff acted as senior pastor for the Church until it closed in 2010.  After the church closed, Plaintiff had no church to pastor, and he attended Pastor Rob Rotola's Word of Life Church.  In 2010, Plaintiff founded an organization called Spirit One Christian Ministries ("Spirit One").   The parties' statements do not discuss the nature of this organization.  Before Dr. Tiller's murder in 2009, Plaintiff and members of the Church conducted many anti-abortion "outreaches" at Dr. Tiller's clinic.  After Dr. Tiller's murder, the Church's marquee stated: "George Tiller – he died the same way he lived."  Defendant has been aware of Plaintiff since approximately 2001 when he protested during the "Summer of Mercy Renewal." (Doc. 262 at 3.)

In 2012, representatives of a "loosely organized coalition of Christian groups" met and discussed ways to oppose operation of Defendant's clinic.  There was no single leader of the group.  As many as thirty pastors attended meetings.  Representatives of the group met with members of the Wichita Police Department (WPD) to discuss a planned pro-life outreach in the College Hill area where Defendant resided.  The group wanted to have a police presence at the event, which was scheduled for November 17, 2012.

John Pride, a representative of a group called Operation Save America, contacted and communicated with WPD Officer David Hinners about the event.  Hinners in turn communicated with "both sides," meaning with Defendant and with Pride or other representatives of the protesters, in an effort to reduce tensions.  Defendant was informed of the November 17 protest

about a week ahead of time by Hinners.  Prior to the November 17 protest, Hinners prepared and circulated an information flier in Defendant's neighborhood that said in part:

> Spirit One Christian Ministries will be conducting an anti-abortion demonstration in the 100 block of South Belmont on Saturday November 17th from 11:30am to 1:00pm.  Spirit One Christian Ministries has expressed that they may be making door to door contact of the homes in the neighborhood.  The Wichita Police Department will have extra officers in the area.  We will be working with all parties to ensure public safety and the protection of individual constitutional rights is a priority.

(Doc. 249-9.)  Hinners testified he could not remember where he got the information that Spirit One was conducting the demonstration and said it could have come from Defendant. (Doc. 261-8 at 4.)  He testified that Rob Rotola and Dave Daubenmire were the "key people" of the group that came in and talked to him or that ended up running the event.  (*Id.* at 6.)

On November 16, 2012, Defendant discussed the upcoming protest with her Trust Women board members.  Defendant said the protest would be held by "Spirit One Church" outside her house.  Members suggested having neighbors write letters to the editor and connecting "the current harassment with the hate and terrorism that led to Dr. Tiller's murder."  (Doc. 260-10 at 2-3.) Defendant also directed an assistant to draft "letters to the editor about the outrage of [protesters] being there" which should "call out Spirit One Christian Ministries, Mark Holick's hate group, and tie it back to what happened to Dr. Tiller." (Doc. 262 at 2.)  Defendant distributed a flyer in her neighborhood advising residents of the planned protest the following day and indicated it would be put on by "Spirit One Christian Ministries and their followers." (Doc. 261-1.)  Also, on November 16, in a Trust Women press release intended for release the next day, Defendant was quoted as saying: "Spirit One Christian Ministries and their followers have taken it upon themselves to try to use shame and harass[ment] of employees as a means to an end – so that Trust Women may not continue its work to open an ob/gyn facility.  Spirit One's actions are tasteless

4

and reprehensible…. This is the same virulent gathering that escalated the rhetoric regarding abortion, which ultimately led to the assassination of Dr. George R. Tiller." (Doc. 259-4.)

 *November 17, 2012 protest*.

 On November 17, 2012, anti-abortion protesters gathered on the north side of Douglas Avenue near the intersection of Douglas and Belmont streets in Wichita, which was about one block (ten houses) away from Defendant's residence on South Belmont.  Plaintiff was present. Some protesters, including Plaintiff, hand-delivered flyers to people in the area that were headlined: "ADOPT AN ABORTION-HOMICIDE PROMOTER."   The flyer contained Defendant's picture and her home address.  It also contained a photograph of an unborn child purportedly undergoing a surgery in utero, in which the child's tiny hand protrudes from the womb and appears to grasp or lay across the finger of one of the medical personnel involved in the procedure.  Among other things, the flyer asserted that Defendant "is responsible for the mass murder of thousands of innocent children"; that "[a]doption is the loving option, not only for babies, but also for adults who have lost their way"; "Please lovingly consider adopting this woman.  She needs to know there is a better way"; urging people to "Adopt [Defendant] and pray for her repentance"; "Do a public outreach at her home [listing the address]"; "Write a letter and ask her to stop murdering innocent babies. Tell her about the forgiveness and love of Jesus Christ, if she is willing to turn from her sins"; "Alert the public to the massacre of innocent children by this woman": "Julie Burkhart is our neighbor, *your* neighbor. As Christians we are called to love her. Our actions could bring her to Jesus and eternal life.  Encourage her to repent of the mass murder of the Lord's preborn children"; and "please reminder her that, 'God hates the hands that

shed innocent blood.'"  The bottom of the flyer indicated it was prepared by "Spirit One Christian Ministries" and listed Plaintiff's phone number. (Doc. 249-10.)[2]

Just prior to the November 17 protest, John Pride and other protesters, including Plaintiff, met with a WPD officer in a nearby parking lot and received instructions on proper behavior, including not creating a disturbance, not impeding anyone from walking down the sidewalk, not trespassing, and staying out of people's yards.  Pride testified no one violated those instructions. Plaintiff cites evidence that during the protest, David Gittrich of Kansans For Life stood on the public sidewalk near Defendant's house, and that Gittrich, Pride, and Rotola were there for the entire event.  Gittrich stated in an affidavit that Rotola "did a little sidewalk preaching through a bullhorn on low volume for a few minutes."  Pride may also have used the bullhorn.

Defendant and her family were not at her residence during the November 17 protest, except for a few minutes when she drove by and talked to some officers.  (Doc. 259-7 at 10.)  Based on what she was told later, she understood protesters formed into three groups, with one group at Douglas and Belmont (north of Defendant's house), one group at Belmont and English (south of Defendant's house), and one group on the public sidewalk directly in front of her house.  (Doc. 259-7 at 18.)   In her deposition, when Defendant was asked whether she knew which group Plaintiff was in, Defendant said, "Well, he was there protesting in my neighborhood, at my house. I don't know which group he dispersed into." (*Id.*)  When asked whether she was testifying that Plaintiff had been in front of her house on November 17, Defendant said "I believe he was in front of my house" based on "[t]he fact that Mark Holick was leading a group of Spirit One parishioners to come to my house to harass and intimidate me and to coerce my neighbors into … I guess

---

[2] A slightly different version of the flyer appears at Doc. 249-11.

forcing me to move out of my neighborhood," and "so it's based on that belief that he was wanting to come to my neighborhood to harass me."  (*Id.*)

Defendant was aware that anti-abortion protesters had protested Dr. Tiller at his church before he was murdered there in 2009, and that they had distributed flyers concerning him.

After the protest on November 17, Defendant talked to Officer Hinners and FBI Agent Fitzgerald.  She complained about the protest as a whole but does not recall singling out any individual.

   *February 15, 2013 protest*.

On February 15, 2013, protesters again picketed in Defendant's neighborhood.  Plaintiff attended the protest.  Defendant believed the signs were similar to the prior incident and she concluded "Spirit One … was back for a second protest."  During this incident, one protester held a sign with a picture of an aborted baby on it and the question "Where Is Your Church?"  (Doc. 260-8.)

Defendant was at her residence during the February 15 protest.  Defendant was unsure which protesters were in front of her house during that incident.  She testified she feared for her safety and was afraid to look out the window and did not accurately observe who was there.  She testified she glanced out at some protesters in front of her house and that she saw Plaintiff with a bull horn.  She also testified that a "Where's Your Church?" sign was left in her yard, against a tree, pointing at her house.

Plaintiff has cited evidence that he did not protest directly in front of Defendant's house at any time, did not hold a sign up or point a sign in front of her house, never used a bullhorn there, and never used inflammatory language there. (Doc. 262 at 4.)  During both protests, Plaintiff was holding a sign on the north side of Douglas Avenue.

Defendant called 911 during the February 15 protest.  Two WPD officers came to her house.  The police report from the incident states that "Victim 1/Burkhart reports S1/[John] Pride and S/2 [Nicholas] Heald disturbing her peace by yelling outside her residence."  Defendant may have provided the names to the officers.  She does not remember complaining to the officers about Holick and the police report contains no mention of him.  Pride testified the police got his contact information and that no further action was taken.  The police did not speak to Holick.  David Gittrich of Kansans For Life testified the group on the sidewalk near Defendant's house on February 15 consisted of himself, Pride, and Heald.

In a February 16 email to her lawyers and others, Defendant discussed the protest by "Holick and his group" and said she planned to go with her lawyer to get a PFS order.  Defendant said that after talking with her husband and a reporter, "it seems that we overlooked one of the sayings on one of the signs" – the "Where's your Church" sign- and she asked, "Isn't this a direct threat?" (Doc. 249-13 at 2.)  Defendant contends she understood the phrase to be a reference to the murder of Dr. Tiller at his church.  Plaintiff, however, cites evidence that pro-life demonstrators have used similar signs since long before Dr. Tiller's murder, and that the signs were intended to encourage Christians and pastors to get more involved in the abortion issue.  (*See* Doc. 262 at 14-15.)

<u>March 7, 2013 PFS Petition and proceedings</u>.

Kansas has adopted the "protection from stalking, sexual assault or human trafficking act" (PFSA).  K.S.A. § 60-31a01. It provides in part that a person may seek relief from stalking by filing a verified petition with a judge of the district court, on a form provided by the clerk.  K.S.A. § 60-31a04.  Stalking means an intentional harassment of another person that places them in reasonable fear for their safety.  Harassment means a knowing and intentional course of conduct

directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose.   A course of conduct requires two or more separate acts evidencing a continuity of purpose which would cause a reasonable person to suffer substantial emotional distress; it does not include constitutionally protected activity.  K.S.A. § 60-31a02.

Within 21 days of filing a PFS petition, "a hearing shall be held at which the plaintiff must prove the allegation of stalking," and "the defendant shall have the opportunity to present evidence."  K.S.A. § 60-31a05(a).  Prior to such a hearing, temporary orders necessary to protect the victim may be granted ex parte on presentation of a verified petition supporting a prima facie case of stalking.  K.S.A. § 60-31a05(b).  If a hearing under subsection (a) is continued, the court may make or extend such temporary orders under subsection (b) as it deems necessary.  K.S.A. § 60-31a05(c).  The court may issue a PFS order granting various forms of relief set out in K.S.A. § 60-31a06.  A PFS order remains in effect until dismissed or modified by the court "and shall be for a fixed period of time not to exceed one year," except that upon motion of the complainant the court may extend the order for an additional year, and under some circumstances the order may be continued for greater periods.  K.S.A. § 60-31a06 (b) & (c).[3]

On March 7, 2013, Defendant filed a PFS petition against Plaintiff in Sedgwick County District Court.  The petition was handwritten by Defendant on a form provided by the court. Defendant listed Plaintiff's work address as the Word of Life Church on Meridian Street. Defendant obtained that information from an internet search.  She additionally listed "Spirit One" at an "unknown address" based upon the flyer indicating Plaintiff was with Spirit One Christian

---

[3] Where a defendant has been personally served and has had an opportunity to present evidence and cross-examine witnesses, and where a judge finds the defendant has violated a protective order or been convicted of certain criminal offenses, the state court upon motion is required to extend a protective order for a period between two additional years and the defendant's lifetime.  K.S.A. § 60-31a06(d).

Ministries and upon Defendant's prior knowledge that Plaintiff was a pastor of Spirit One Church.

(Doc. 249-7 at 6.)  Defendant alleged three incidents in the petition:

> Incident # 1:  Sat. Nov. 17, 2012, 11:30 a.m. – 1:30 p.m. Picketing @ my house and my neighborhood.  Handed out a wanted-style flyer about me, Julie Burkhart.  Had posters w/ inflammatory language.
>
> Incident #2:  Fri. Feb. 15, 2013, 7:30 a.m. – 9:30 a.m. Pointed a sign towards my house that said "WHERE'S YOUR CHURCH."  My former boss was murdered in his church.  Used a bull horn or way to magnify volume.
>
> Additional Incident(s), if any:  January 2013 – Mark Hollick [sic] was at my place of business, standing in the middle of the driveway, with John Pride.  He also walked the perimeter of the building, scoping it out.

(Doc. 249-11).  In a space to explain why she needed a PFS order, Defendant stated it was because "he is engaging in behavior meant to scare and intimidate me.  He also uses violent language, which I take very seriously."  (*Id.*)  Defendant attached a copy of the flyer to her PFS petition.

In his response, Plaintiff cites Defendant's deposition testimony concerning her allegations in the PFS petition.  Construed in the light most favorable to Plaintiff, it would allow a jury to infer that Defendant did not in fact see Plaintiff handing out flyers or picketing in front of her house or displaying posters with "Where's Your Church" on it, but she considered Plaintiff to be the leader of the group and the other people to be his followers, such that she considered him responsible for any actions that took place.  (*See* Doc. 259-7 at 24-25.)  Defendant also testified that during the February 15 incident, she glanced outside her window and saw what she alleges looked like Plaintiff leading protesters in front of her house.  She described the man as being tall, slender, Caucasian, in his fifties or sixties, and "kind of balding on top."  (*Id.* at 21.)  Plaintiff cites evidence that he was not in front of the house and that Rob Rotolo was the "balding man" (so described by Defendant) shown in a video recording of the incident.  With respect to the incident at Defendant's clinic in 2013, Plaintiff cites evidence that he was present at the gate of the facility but did not

block the driveway or walk the perimeter of the building.  John Pride testified he and another individual walked the perimeter and that Plaintiff stayed by the gate. (Doc. 260-1 at 6; 260-2 at 5.)

On March 7, 2013, the same date the petition was filed, a state judge found Defendant had established a prima facie case of stalking and issued an order directing Plaintiff, among other things, not to follow, harass, contact, abuse, or molest Defendant, and not to enter or come on or around Defendant's residence or workplace.  (Doc. 249-17.)  The order stated that it "shall remain in effect until service of the final order or until terminated by order of the court."  It also stated that a hearing was set for March 21, 2013.  Plaintiff initially obtained a continuance of hearing to March 28; Defendant then obtained a continuance to April 11, 2013. (Doc. 6-2 at 41.)

Plaintiff and his counsel made a strategic decision not to have a hearing within 21 days. Instead, on April 4, 2013, Plaintiff's counsel filed a motion to dismiss the PFS petition, which did not challenge the truth of the allegations but argued the allegations involved constitutionally protected activity.  In mid-2013, the parties engaged in some settlement discussions, but were unable to reach agreement.  (Doc. 261-5.)  On November 2, 2013, the state judge denied Plaintiff's motion to dismiss, saying there were questions of fact "such as what [Holick] meant by the statement of 'Where's Your Church'" and whether his actions were protected by the First Amendment in light of the significant privacy interests pertaining to the home.  (Doc. 6-4.)  Neither Plaintiff nor Defendant sought an evidentiary hearing on the merits of Defendant's PFS petition at any time during 2013 or 2014.

In January 2015, Officer Hinners saw Plaintiff protesting near Douglas and Belmont.  He inquired through the sheriff's office whether the PFS order was still in effect and was told that it was.  Hinners also emailed Defendant and asked about the PFS order. (Doc. 261-7 at 8.) Because the legal issue was "touchy," Hinners wrote up a complaint and sent it to a city prosecutor instead

of seeking to make an arrest.  The prosecutor declined charges due at least in part to doubts about whether the PFS order was still in effect.  (Doc. 261-8 at 2-3.)  On March 26, 2015, Officer Hinners had an email exchange with Defendant. Hinners asked if Defendant's lawyers had found paperwork showing they had received an extension of the PFS order on Plaintiff.  (Doc. 261-7 at 12.)  After Defendant responded that she would check, Hinners replied that if there was not an extension then the PFS order is "probably not good anymore." (*Id.* at 14.)

On April 6, 2015, Plaintiff filed an extensive (81 pages) motion and brief for summary judgment in the PFS action.  (Docs. 249-22, 23.)  Defendant sought additional time to respond. On May 7, 2015, Defendant filed a 3-page motion to voluntarily dismiss the action pursuant to K.S.A. § 60-241(a), arguing the temporary PFS order had expired by operation of law no later than March 7, 2015, such that there "is no actual controversy before the court," and that the action should be dismissed without prejudice for lack of jurisdiction.  (Doc. 6-5.)  On June 10, 2015, following a hearing, a state judge found that under the PFSA, no final order could be issued based upon two-year-old allegations, and he granted Defendant's motion to voluntarily dismiss the action, citing K.S.A. § 60-241(a)(2).  (Docs. 6-6, 249-24.)  He noted the statute contemplated having a hearing shortly after the filing of a PFS petition, and that "either party could have forced the issue on whether to have a final hearing, [but] for whatever reason, that wasn't done." (Doc. 6-6 at 10.)  The judge declined "to put any weight" into arguments concerning the protesting incident in January 2015, because that issue was "not before the Court," and he further declined to find whether or not the temporary order "was still in place or not" at that time.  The court declined to award attorney's fees to either party.

On August 24, 2015, Plaintiff filed a motion to alter the judgment to allow attorney's fees and costs, arguing dismissal of the case should be conditioned upon payment of such fees.  Under

K.S.A. § 60-31a06(f), the court could award attorney fees to Plaintiff if it found the PFS petition for relief was "without merit."  On September 24, 2015, a state judge held a hearing on the motion. Plaintiff testified at the hearing about his involvement in the protests and asserted that the allegations against him in the PFS petition were untrue.  The judge denied Plaintiff's motion to amend the judgment.  (Doc. 6-2.)  The judge reiterated his previous finding that Defendant could not "argue for a continued protection from abuse order for … events that happened two and a half years ago. So it's just an exercise in futility, forcing [her] to go forward on something that she can't obtain."  (*Id.* at 50.)  The judge also declined to find the PFS petition was "without merit" for purposes of attorney's fees, saying the court's previous denial of Plaintiff's motion to dismiss the PFS petition implicitly ruled "that there was merit in the petition."  (*Id.* at 57.)  Plaintiff did not appeal the judgment.

## III.    Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.  *Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 761 (10th Cir. 2017).  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial.  *Id.*  The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

**IV. Discussion**

1. **Malicious prosecution**.   In Kansas, a plaintiff asserting a claim for malicious prosecution must prove the following elements:

> 1) that the defendant initiated, continued, or procured civil procedures against the plaintiff;
>
> 2) that the defendant did so without probable cause;
>
> 3) that the defendant acted with malice – that is, defendant acted primarily for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based;
>
> 4) that the proceeding terminated in favor of the plaintiff;[4] and
>
> 5) that the plaintiff sustained damages.

*In re Landrith*, 280 Kan. 619, 647, 124 P.3d 467, 484-85 (2005) (citing *Bergstrom v. Noah*, 266 Kan. 829, 974 P.2d 520 (1999)). Defendant contends that Plaintiff's malicious prosecution claim fails as a matter of law because the PFS action did not terminate in Plaintiff's favor and because Defendant had probable cause to file a PFS petition. (Doc. 249-1 at 1.)

A.   Termination in favor of Plaintiff. After reviewing the Kansas law pertaining to malicious prosecution and the circumstances surrounding dismissal of the PFS action, the court finds a genuine issue of fact as to whether the PFS proceedings terminated in Plaintiff's favor.

In addressing malicious prosecution claims, Kansas courts consistently apply the Restatement (Second) of Torts. *See Bergstrom,* 266 Kan. at 838; *Nelson v. Miller,* 227 Kan. 271, 607 P.2d 438 (1980) ("*Nelson I*").   Under those standards, the withdrawal of a claim in the underlying proceeding can satisfy the element that the proceeding must have terminated in favor of the malicious prosecution plaintiff. *See Nelson*, 227 Kan. at 280 (citing Restatement (Second)

---

[4] *In re Landrith* refers to a termination in favor of "the plaintiff," meaning the party asserting a claim for malicious prosecution.  Other cases refer to a termination in favor of "the defendant," meaning the party against whom the underlying civil proceeding was brought.  *See Nelson v. Miller,* 227 Kan. 271, 276, 607 P.2d 438, 443 (1980).

of Torts § 674).[5]  "Whether a withdrawal or abandonment constitutes a final termination of the case in favor of the person against whom the proceedings are brought and whether the withdrawal is evidence of a lack of probable cause for their initiation, depends on the circumstances under which the proceedings are withdrawn."  Restatement (Second) of Torts § 674, comment. j; *Nelson*, 227 Kan. at 280.

*Nelson I* reviewed early Kansas decisions addressing this "favorable termination" element. In *Bratton v. Exchange State Bank*, 129 Kan. 82, 129 P. 857 (1929), for example, the court found that abandonment of a claim through amendment of the pleadings was a termination of the claim in favor of the underlying defendant.  The abandonment "was the same as if the action had been dismissed" and "[f]or that reason, the action as to those causes of action had terminated in favor of" the party against whom they were brought.  *Id.,* 129 P. at 859.  In *Marbourg v. Smith*, 11 Kan. 554 (1873), where the underlying claim was dismissed pursuant to a settlement that required the party bringing the claim to pay the costs of the action, the circumstances supported a malicious prosecution claim: "If the action has been dismissed, as in this case, that is sufficient, if the action has not been commenced again."  *Id.* at 562.  *Marbourg* indicated that as long as the underlying action was terminated, and the party bringing that claim did not obtain a judgment, "we suppose the action for malicious prosecution may be maintained" if the necessary facts can be shown. *Id.* at 562.  Otherwise, the court said, a suit could be maliciously brought without probable cause merely to harass and cause expense to the other party.  In such circumstances, "can the plaintiff relieve himself from liability to an action for malicious prosecution by simply dismissing his action," thereby leaving the defendant with no remedy? *Id.* at 563.  Because the answer to these

---

[5] *Nelson I* identified three situations, taken from the Restatement, in which a civil claim may be terminated in favor of a defendant in the underlying action: (1) an adjudication by a competent tribunal in defendant's favor; (2) the plaintiff's withdrawal of the claim; or (3) a dismissal of the claim for a failure to prosecute. 227 Kan. at 280, 607 P.2d 438.

rhetorical questions was obviously no, *Marbourg* found the trial court correctly refused to instruct the jury that the settlement of the underlying claim precluded recovery by the malicious prosecution plaintiff.  *Id.*

In *Nelson I,* a medical malpractice claim against Dr. Nelson was dismissed without prejudice under a stipulation between opposing counsel.  The stipulation provided that if further discovery showed a basis to rejoin Dr. Nelson, he would not then assert a statute of limitations defense.  Dr. Nelson subsequently filed a malicious prosecution claim, but the trial court dismissed it after concluding the malpractice action had not terminated in Dr. Nelson's favor.  On appeal, the Kansas Supreme Court reversed, noting the "scanty record" before the district court and stating that a dismissal without prejudice could be a favorable termination.  *Nelson,* 227 Kan. at 281, 285 ("It is thus the law that a voluntary dismissal of the prior action without prejudice may be a termination in favor of the person against whom that action was brought.")  The supreme court remanded for discovery and further proceedings.  On remand, the district court allowed discovery but again dismissed the claim, this time ruling on summary judgment that the underlying termination was not favorable to Dr. Nelson because it was "indecisive" and was obtained as a result of a settlement.  The state supreme court again reversed.  *Nelson v. Miller,* 233 Kan. 122, 660 P.2d 1361 (1983) ("*Nelson II*").  In doing so, the Kansas Supreme Court reviewed the circumstances leading to dismissal of the malpractice action, including the attorneys' knowledge and beliefs when they agreed to dismissal, and concluded there were two different versions of what happened.  The defendants asserted the dismissal was the result of a compromise.  Dr. Nelson argued the dismissal resulted from the defendants' "realization that they had no case against him."  The supreme court said a jury could find either version to be the case, such that the material facts

"were in substantial dispute" and "a question for the jury is presented." *Id.* at 131, 660 P.2d at 1368.

These cases clearly establish that voluntary dismissal of a claim can support the "favorable termination" element of a malicious prosecution claim. And a reasonable jury examining the particular circumstances of the dismissal of the PFS action could find the termination was favorable to Plaintiff. Defendant dismissed her PFS petition without obtaining any adjudication of the merits of the stalking claim. The temporary PFS order Defendant obtained was issued solely upon her verified petition, without any adjudication of the facts, and that order either expired by operation of law (the state judge expressed some doubt whether that occurred), or it was extinguished by dismissal of the PFS petition. At any rate, the dismissal of the action ensured that the temporary order was no longer in effect. The dismissal thus cleared Plaintiff of any potential jeopardy from the temporary PFS order or from the pending PFS petition. It also relieved Plaintiff of any potential jeopardy from the incident in January of 2015, for which Officer Hinners filed a complaint alleging Plaintiff had violated the temporary PFS order. Defendant conceded in her motion to dismiss the PFS action that she could not obtain a permanent PFS order at that point. The state judge agreed and granted the motion to dismiss on that basis. Defendant's abandonment of her PFS claim, like the dismissals in *Nelson II, Bratton,* and *Marbourg*, can reasonably be considered a termination of the action in Plaintiff's favor.

Defendant argues Kansas law provides that a favorable termination cannot be "merely a procedural victory," and a dismissal must at least "reflect on the merits" or "be consistent with a finding for the defendant on substantive grounds." (*See* Doc. 249-1 at 22) (citing, *inter alia, Miskew v. Hess,* 21 Kan.App.2d 927, 910 P.2d 233 (1996)). Defendant relies heavily on authority from lower courts in Kansas, as well as cases from other states. As explained *supra*, this is likely

due, at least in part, to the fact that authority from the Kansas Supreme Court is quite to the contrary.  The Kansas Court of Appeals recognized as much in *Ball v. Credit Bureau Svcs., Inc.*, 353 P.3d 469 (Table), 2015 WL 4366440 (Kan. Ct. App. June 26, 2015), where the court observed that an "argument that the termination must depend, at least in part, on some determination of the underlying merits of the dismissed claim cannot be reconciled with Kansas law on malicious prosecution." *Id.*, 2015 WL 4366440, *7 (citing *Nelson,* 227 Kan. at 280, 607 P.2d 438).  It is obviously true that for malicious prosecution to be established, the prior termination cannot have been *inconsistent* with a claim that probable cause for the underlying action was lacking.  But the Kansas Supreme Court has not required that the basis for dismissal must affirmatively show that the claim lacked merit. As *Ball* suggested, this argument seems to conflate the requirement of showing a favorable termination and the requirement of showing a lack of probable cause. *Id.* ("The question of merit really bears more on those elements of malicious prosecution [ulterior purpose and lack of probable cause] rather than the method of termination.")  But even so, if all inferences from the evidence cited in this matter are drawn in Plaintiff's favor, Defendant's voluntary dismissal of the PFS action, in the face of the pending summary judgment motion and based on a concession that Defendant could not obtain a permanent PFS order, would support a reasonable inference that the claim was lacking on the merits.  Plaintiff has cited evidence that could support the element of a favorable termination.

   B. Probable cause.  Defendant next contends the undisputed evidence shows that Defendant had probable cause to file for a PFS order. (Doc. 249-1 at 25.)

   An action for malicious prosecution requires Plaintiff to prove (among other elements) that Defendant initiated the PFS proceedings without probable cause.  "Probable cause for instituting a proceeding exists when there is a reasonable ground for suspicion, supported by circumstances

sufficiently strong in themselves to warrant a cautious, or prudent, man in the belief that the party committed the act of which he is complaining." *Nelson,* 227 Kan. at 277, 607 P.2d at 443-44.  The inquiry is generally limited to the facts and circumstances as they appeared to Defendant when the action was commenced.  *Id.*  As explained in the Restatement, a party has probable cause if she "reasonably believes in the existence of the facts upon which the claim is based" and either (a) correctly or reasonably believes that under those facts the claim may be valid under the applicable law, or (b) believes to this effect in good faith reliance upon advice of counsel after full disclosure of all known facts.[6]  Restatement (Second) of Torts, § 675.

Defendant contends she had probable cause, among other reasons, because: she knew Plaintiff "was the leader of Spirit One" before the protests; protesters "targeted [her] at her home" on two occasions and Plaintiff attended both protests; the protesters were handing out flyers with Plaintiff's organization and telephone number listed on them that described her as a mass murderer; a visible sign during the protest said, "Where Is Your Church?", and Defendant considered that sign a reference to the murder of Dr. Tiller in his church by an anti-abortion activist.  (Doc. 249-1 at 27.)

Defendant's argument does not account for what a jury viewing the evidence in Plaintiff's favor could conclude were numerous false or misleading allegations in the PFS petition.  Without suggesting anyone other than Plaintiff was involved, the PFS petition named Plaintiff and alleged "picketing [at] my house and my neighborhood," handing out a "wanted-style flyer," "had posters [with] inflammatory language," "pointed a sign towards my house," "used a bull horn … to magnify volume," "Mark Hollick [sic] was at my place of business, standing in the middle of the driveway" and "[h]e also walked the perimeter of the building," and "he … uses violent

---

[6] Defendant has not asserted a defense of reliance on counsel in this case.  (Doc. 253.)

language….." (Doc. 259-1.)  There is evidence from which a jury could conclude that Plaintiff did not engage in any of these acts.  More to the point, a jury examining all the circumstances - including Defendant's proffered explanations - could conclude that Defendant did not have a reasonable factual basis for alleging that Plaintiff engaged in these actions.  For example, the allegation that Plaintiff protested not only in her neighborhood but "[at] her house" on November 17, 2012, was apparently "based on [a] belief that he was wanting to come to my neighborhood to harass me." (Doc. 259-7 at 18.)  At another point in her deposition Defendant conceded she did not know which group Plaintiff was in on November 17.  *Id.*  At yet another point Defendant seemingly testified that the allegations were directed "at a group of people," but she named only Plaintiff because she believed the group was "led by" him.  *Id.* at 50.  When asked if she saw Plaintiff holding a poster with inflammatory language during the first incident, Defendant replied, "he might have been.  I don't know." *Id.* at 51.  Defendant admitted she could not say who pointed the "Where's Your Church" sign at her house, and she offered no factual basis for concluding it was Plaintiff other than her belief that Plaintiff "was working that day to incite violence against me." *Id.* at 50-51.

During the second incident, Defendant only glanced out her window and then stayed back from it due to safety concerns, but she allegedly saw Plaintiff in front of her house using a bullhorn. It is uncontroverted for purposes of summary judgment that Plaintiff was not in front of the house with a bullhorn on that or any other occasion.  Whether Defendant's allegation to the contrary was based on a good-faith error, or whether it was instead a knowing falsehood prompted by malice, is a question of fact.  Evidence that Defendant had strongly condemned Plaintiff prior to either protest, as well as other circumstances, could reasonably be viewed by a jury as supporting the latter conclusion.

With respect to the third incident in the PFS petition, Plaintiff cites evidence that he did not block the clinic driveway or walk the perimeter.  Defendant conceded in her deposition that during this incident Plaintiff was actually standing where the public sidewalk crossed the driveway.  *Id*. at 50.  The petition did not mention that fact, nor did it mention that the sidewalk at the clinic was a frequent protest site that has been used by large numbers of protesters.  As for the allegation that Plaintiff "uses violent language," Plaintiff denies the allegation, and Defendant cites nothing to show a good-faith basis for making that claim.  Finally, the fact that Defendant failed to timely prosecute her claim in the PFS case, voluntarily dismissed her claim when faced with a summary judgment motion, and ultimately conceded she could not obtain a PFS order at that point could be viewed as showing a lack of probable cause for the claim.  In sum, because there are material facts in dispute concerning Defendant's state of knowledge and the basis for her asserted stalking claim, the issue of probable cause is a matter properly submitted to a jury.  *Cf. Bergstrom,* 266 Kan. at 837, 974 P.2d at 526 ("where the facts tending to establish the existence or want of probable cause are in dispute, the trial court has the duty to submit the question to the jury.")

2. **<u>Abuse of process</u>**.  The elements of abuse of process in Kansas are:  1) that the defendant made an illegal, improper, perverted use of the process (a use neither warranted nor authorized by the process); 2) the defendant had an ulterior motive or purpose in exercising such process; and 3) damage resulted to the plaintiff from the irregularity.  *Porter v. Stormont-Vail Hosp.*, 228 Kan. 641, 646, 621 P.2d 411, 416 (1980) (citing 1 Am. Jur. 2d *Abuse of Process* § 4).  Defendant contends there is no evidence to support a finding that she made an illegal or improper use of process or that she acted with an ulterior motive.

A. Illegal or improper use of process.  For the reasons stated below, the court finds Plaintiff has failed to cite evidence from which a jury could reasonably conclude that Defendant made an illegal or improper use of process, within the meaning of Kansas law, in the PFS action.

In Kansas,

[a]n action for abuse of process differs from an action for malicious prosecution in that the latter is concerned with maliciously causing process to issue, while the former is concerned with the improper use of process after it has been issued.  Thus it is said in substance that the distinction between the two is that malicious use of process is the employment of process for its ostensible purpose, but without reasonable or probable cause, whereas the malicious abuse of process is the employment of a process in a manner not contemplated by law, or to obtain an object which such a process is not intended by law to effect.

*Jackson & Scherer, Inc. v. Washburn,* 209 Kan. 321, 331, 496 P.2d 1358, 1366 (1972) (quoting 1 Am. Jur. 2d *Abuse of Process* § 2).  In other words, abuse of process does not consist of "commencing an action or causing process to issue without justification, but misusing or misapplying process, justified in itself, for an end other than that which it was designed to accomplish."  *Id.* (citation omitted.)

Defendant pursued the PFS action based on allegations that Plaintiff picketed at her house, displayed posters with "inflammatory language," handed out a "wanted-style" flyer about her, pointed a sign at her house that conveyed a threat of violence, used a bullhorn to magnify his volume, stood in the middle of her business's driveway, and used "violent language."  As indicated previously, Plaintiff's evidence raises a genuine issue as to whether Defendant had a reasonable basis for making those allegations. But Defendant did make such allegations, and the PFS process that she obtained is intended for the purpose of restraining at least some of the behaviors she claimed – such as harassing or interfering with privacy rights (use of a bullhorn in front of a residence), making implied threats of violence (use of violent language and a threatening sign), and trespass (picketing at a house and obstructing a driveway).

A treatise relied on by the Kansas courts explains why the uncontroverted facts here do not support a claim for abuse of process:

> Abuse of process contemplates some overt act done in addition to the initiating of the suit; thus, the mere filing or maintenance of a lawsuit, even for an improper purpose, is not a proper basis for an abuse of process action.  Generally, therefore, no right of action exists for damages resulting from the institution and prosecution of a civil action if the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint, *even if the plaintiff had an ulterior motive in bringing the action, or if the plaintiff knowingly brought suit upon an unfounded claim.*

1 Am. Jur. 2d *Abuse of Process* § 11 (emphasis added).  Even if, as Plaintiff claims, Defendant knew her claims were unfounded, the PFS action was confined to its regular function in relation to the claims asserted, and it will not support a claim for abuse of process.  Similarly, even if Defendant had an ulterior motive in bringing the action, "mere ill will or spite … does not constitute an ulterior or improper motive … where the process is only used for the purpose for which it was designed…." *Id.* § 6.[7]

---

[7] The court recognizes that considerable confusion may exist over the exact contours of an abuse-of-process claim.  In 1932 the author of an ALR noted that

> [s]ome confusion exists as to the nature and essentials of actions for abuse of process. Much of the confusion is either verbal only, or has resulted from a want of consistency and accuracy in distinguishing between the act of maliciously procuring the issuance of process, and the act of abusing process when issued.
>
> Where the matter complained of concerns the issuance of process, the action is either strictly or by analogy one for malicious prosecution. . . .  But where the thing complained of is not that issuance of the process was wrongfully procured, but that, having been issued, it was wilfully perverted, so as to accomplish a result not commanded by it or lawfully obtainable under it, the action has been denominated by well considered cases as one for the abuse of process. As to such an action it is not, in reason or in law, essential that the process should have been wrongfully issued, or that it should have been issued maliciously or without cause, and consequently it is immaterial whether such process has or has not been discharged. It is sufficient that the one party has wilfully abused the process to the damage of the other. . . .
>
> . . . .
>
> The gist of an action for abuse of process is the improper use of process after it has been issued.

Annotation, *Action for Abuse of Process*, 80 A.L.R. 580 (Originally published in 1932).  Almost ninety years later, little has changed.  Confusion still abounds regarding what is, and what is not, abuse of process.  For example, the Court notes that the Kansas pattern jury instruction on abuse of process bears little resemblance to the elements described by the Kansas Supreme Court in *Porter*.  *Compare* PIK-Civil 4th 127.80, ABUSE OF PROCESS *with Porter*, 228 Kan. at 646, 621 P.2d 416.  However, the common thread that guides the outcome here is this notion that

### V. Conclusion

**IT IS THEREFORE ORDERED** this 15th day of May, 2019, that Defendant's motion for summary judgment (Doc. 249) is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED as to the claim for abuse of process and DENIED as to the claim for malicious prosecution.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE

---

"[t]he gist of an action for abuse of process is the improper use of process after it has been issued."  80 A.L.R. 580. In this case, the facts indicate that the process in the PFS case was barely used at all; and to the extent it was used (Officer Hinner's 2015 complaint regarding Plaintiff's protests near Defendant's residence), that was within the bounds of the purpose for which it was designed.